970 So.2d 1067 (2007)
STATE of Louisiana
v.
Christopher Sheldon ARNOLD.
No. 2007 KA 0362.
Court of Appeal of Louisiana, First Circuit.
September 19, 2007.
*1069 Joseph Waitz, District Attorney, Juan Pickett, Ellen Daigle Doskey, Assistant District Attorneys, Houma, Counsel for Appellee State of Louisiana.
Prentice White, Baton Rouge, Counsel for Defendant/Appellant Christopher Sheldon Arnold.
Before: GAIDRY, McDONALD, and McCLENDON, JJ.
McCLENDON, J.
The defendant, Christopher Sheldon Arnold, was charged by bill of information[1] with armed robbery, a violation of LSA-R.S. 14:64. The defendant pled not guilty. Following a jury trial, the defendant was found guilty as charged. The defendant was sentenced to forty (40) years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant now appeals designating two counseled and two pro se assignments of error. We affirm the conviction and remand.

FACTS
On June 27, 2003, Darryl Price and another perpetrator, identified at trial by Price and other witnesses as the defendant, committed an armed robbery at the Bank One University Branch in Terrebonne Parish. They took over $35,000 from the bank.
According to the testimony of Price and Roger Parker, Jr., Price, Parker, William Smith, and Alicia, a friend of Parker, drove to Louisiana from California several days before the robbery. In California, Price, Parker, and William Tribble had discussed robbing a bank in Louisiana. A day or so after arriving in Louisiana, Price and Parker picked up Tribble and the defendant from the New Orleans Airport. They rented two rooms at the Deauville Motel in Thibodaux and formulated a plan to rob the bank. Present at this meeting were Price, Tribble, Parker, Milton Livas (Parker's cousin from Louisiana), and the defendant. In preparation for the robbery, they bought a car, phones, and walkie-talkies. The guns to be used were obtained from Tribble and Livas.
On the day of the robbery, Price and the defendant parked in the bank parking lot. Parker, Tribble, and Livas sat in the newly-bought car across the street from the bank. Gladys Harris, a friend of Price, was waiting in a third car at an arranged location. Price entered the bank and stood in line. Ten to twenty seconds later, the defendant entered the bank, pulled out his gun, announced it was a holdup, and ordered everyone to get down on the floor. Price jumped the counter, pulled out his gun, and told one of the female employees to open the safe. She opened the safe, but it contained only coins. At this point, another female employee *1070 approached the defendant and told him to take the money "in the teller." The defendant went to three different teller spots and had an employee put money from each spot into a pillowcase. When the defendant told Price that their time was up, Price and the defendant exited the bank and drove away in their car. Moments later, a red dye pack exploded in the pillowcase full of money. Price continued to drive. Several blocks later, however, he lost control of the car and crashed into a ditch. Price and the defendant ran in opposite directions. According to Price, the defendant had the money with him.
Brian Davis, an eyewitness to the accident, testified at trial that, prior to the car going into a ditch, he saw "red stuff" fly out of the passenger window. After the car crashed, Davis described the person who got out of the driver's seat as a "black guy." He described the person who got out of the passenger seat as a "Mexican guy." He further testified that the "black guy" was running with a white bag in his hand, and that the other man had nothing.
Moments later, Tribble picked up the defendant. Unable to find Price, they returned to the motel room. Price, who had run to an enclosed shed-like area of a nearby house, removed the outer layer of his clothing and exposed another layer of clothes underneath. After hiding for a while, Price emerged and was apprehended by six police officers. Price was arrested and Mirandized. He then gave a recorded statement to Detective Malcolm Wolfe. According to Price, his testimony given at trial was essentially the same as the statement he gave to Detective Wolfe. In his statement, Price told Detective Wolfe about all those involved in planning the armed robbery and about the rented motel rooms. Price also stated that he and the defendant went inside the bank with guns. Based on Price's statement, Detective Wolfe was able to apprehend some of those involved with the armed robbery, including the defendant. However, Parker, Tribble, and Harris drove back to California before they could be apprehended. Parker was arrested about thirty days later in California. Parker identified the defendant as a perpetrator of the armed robbery.
Three eyewitnesses to the robbery at the bank testified at trial. Tommy Picou, a customer, positively identified the defendant as one of the two perpetrators of the armed robbery. According to Picou, as he was walking out of the bank with his family, the defendant walked in, pointed a gun at Picou, and told him and his family to get back into the bank and get on the floor. As the defendant was walking in, Picou stated that, as the defendant was walking in, it looked as if the defendant was putting on a hat and covering his face with a bandanna. On cross-examination, Picou testified that, although he was asked by a police officer to try to identify any suspects shortly after the robbery, he could not.
Curt Domangue, the bank manager, testified that the person who was pointing a gun at Picou had a cap on and a bandanna covering his face. Domangue stated that the gunman had a light tan and described him as "almost Hispanic" or Indian. On cross-examination, Domangue stated that when he gave a recorded statement to the police, he did not mention that the perpetrator was Hispanic or Indian. When asked if he could see the perpetrator's face, Domangue testified, "Not with the bandanna over his nose and mouth."
Julie Olin, the assistant manager at the bank, positively identified the defendant as one of the perpetrators of the armed robbery. She testified that she and the defendant were looking at each other when the defendant entered the bank. According *1071 to Olin, the defendant then pulled his sweatshirt up over his face and screamed, "Don't look at my face!" Olin described the defendant as "white complected  like real light."

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant argues that the evidence was insufficient to support the armed robbery conviction. Specifically, the defendant contends that the state failed to prove his identity as a perpetrator of the armed robbery.[2]
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; LSA-Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. See LSA-C.Cr. P. art. 821(B). The Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno, 2001-2585, pp. 4-5 (La. App. 1 Cir. 6/21/02), 822 So.2d 141, 144. Furthermore, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. Positive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. State v. Hughes, XXXX-XXXX, pp. 5-6 (La.11/29/06), 943 So.2d 1047, 1051.
In Louisiana, an accomplice is qualified to testify against a co-perpetrator even if the state offers him inducements to testify. The inducements would merely affect the witness's credibility. Additionally, a conviction may be sustained on the uncorroborated testimony of a purported accomplice, although the jury should be instructed to treat the testimony with great caution. When the accomplice's testimony is materially corroborated by other evidence, such language is not required. An accomplice's testimony is materially corroborated "if there is evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation." State v. Castleberry, 98-1388, p. 13 (La.4/13/99), 758 So.2d 749, 761, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999) (quoting State v. Schaffner, 398 So.2d 1032, 1035 (La.1981)); Hughes, XXXX-XXXX at p. 6, 943 So.2d at 1051.
Louisiana Revised Statutes 14:64(A) provides:
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
Armed robbery is a general intent crime. In general intent crimes, the *1072 criminal intent necessary to sustain a conviction is shown by the very doing of the acts which have been declared criminal. State v. Payne, 540 So.2d 520, 523-524 (La.App. 1 Cir.), writ denied, 546 So.2d 169 (La.1989).
Parties to crimes are classified as principals and accessories after the fact. LSA-R.S. 14:23. Principals are "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime. . . ." LSA-R.S. 14:24. Only those persons who knowingly participate in the planning or execution of a crime are principals. An "individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state." State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428 (per curiam) (quoting State v. Holmes, 388 So.2d 722, 726 (La.1980)). "The state may prove a defendant guilty by showing that he served as a principal to the crime by aiding and abetting another. Under this theory, the defendant need not have actually performed the taking to be found guilty" of a robbery. State v. Smith, 513 So.2d 438, 444-445 (La.App. 2 Cir.1987).
In the case at hand, several witnesses provided positive identification of the defendant as one of the perpetrators of the armed robbery. Julie Olin testified that when the defendant walked into the bank, "we were looking eye to eye at each other." The defendant then took his gun out and pulled his sweatshirt up over his face. Olin positively identified the defendant in court and testified that when the defendant first came in the bank, "I could ID him exactly because he didn't have a hat on, and his face wasn't covered up." According to Olin, the defendant's face was not covered until he had walked further into the bank.
Darryl Price, who had already pled guilty to the armed robbery at the Bank One, testified that he had not yet been sentenced and that no promises were made to him that he would get a particular sentence if he testified at trial. Price testified that the first time he met the defendant was when Price, Parker, and William Smith (Parker's cousin) picked up the defendant from the New Orleans Airport. Price, Tribble, Parker, and the defendant went to the motel room, where they and Livas made plans for the robbery. The plan was for Price to stand in line at the bank, followed by the defendant entering the bank about ten seconds later and announcing the holdup. On the day of the robbery, Price drove, and the defendant was in the front passenger seat. Price parked in the bank parking lot, and went into the bank first. Shortly afterward, the defendant entered the bank, and said, "Everybody down, it's a hold-up." Price jumped the counter, pulled out his gun, and began putting money in a pillowcase. The defendant paced around and kept Price informed about how much time he had left before they had to leave. They exited the bank and got in their car. Price drove with the defendant seated on the passenger side. Price put his gun in the back seat, and the defendant put his gun inside the pillowcase with the money. Price positively identified the defendant in court as the person who came into the bank with Price and was part of the robbery.
Roger Parker, Jr., who at the time of the trial was also charged with the armed robbery, testified that the first time he met the defendant was when Parker and Price picked the defendant up from the airport. Parker, Livas, Price, Tribble, and defendant went to the motel room and *1073 made plans for the robbery. On the day of the robbery, Parker sat with Tribble in a car parked across the street from the bank. Parker saw Price enter the bank and then saw the defendant enter the bank about twenty seconds later. Tribble had a phone and the defendant had a phone, so that they could communicate with each other. When the robbery was complete, Parker saw Price and the defendant exit the bank, get into their vehicle, and drive out of the parking lot. Price was driving, and the defendant was in the passenger seat. Tribble, who was driving the car that had been parked across the street, began to follow Price and the defendant, but momentarily lost them when he was held up at a traffic light. When Tribble reached the point where Price was supposed to turn, they saw Price's car in a ditch. The car was empty, so they began looking for Price and the defendant. They found the defendant running and picked him up. The defendant was screaming that he could not see because the money "blew up." Unable to find Price, they went back to the motel room.
The defendant contends that the testimony of Price and Parker is not reliable because, as co-conspirators, their motivation for identifying the defendant as a perpetrator was to receive leniency from the state. Price and Parker admitted to their roles in the armed robbery. At trial, they also named several other participants in the armed robbery, as well as those involved in the planning of the armed robbery. There is nothing in the record that suggests that Price or Parker would receive reduced sentences if they testified against the defendant. In fact, Price specifically testified at trial that the state made no promises to him based on his agreement to testify.
The testimony of Price and Parker, insofar as the identity of the defendant was concerned, was confirmed by other evidence introduced at trial. For example, Julie Olin, the assistant manager at Bank One, made an in-court positive identification of the defendant as one of the two perpetrators involved in the bank robbery. She testified that she and the defendant looked directly at each other before the defendant covered up his face. Also, Allen LeBlanc, a Terrebonne Parish Sheriff's Office detective who investigated the armed robbery, testified that he obtained a search warrant to search the Deauville Motel, where most of the participants in the armed robbery had met to discuss their plans. Among the things found pursuant to Detective LeBlanc's search was a Southwest Airlines ticket stub with the name "Christopher slash A-r-n-o" on it, referencing a June 25 flight from Phoenix, Arizona to New Orleans; a University of Phoenix ID card with the name of Christopher Arnold on it; and a Southwest luggage tag with Christopher Arnold's name, address, and phone number on it.
It is clear from the finding of guilt that the jury concluded that the testimony of Price, Parker, and Olin was credible and reliable enough to establish the defendant's guilt. In finding the defendant guilty, it is clear the jury rejected the defense's theory of misidentification.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. State v. Taylor, 97-2261, pp. 5-6 *1074 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. State v. Mitchell, 99-3342, p. 8 (La.10/17/00), 772 So.2d 78, 83.
The defendant also contends that the identification of him through a photographic lineup was unreliable because it was unduly suggestive. The reliability of any photographic lineup in the instant matter is irrelevant. When Price and Parker identified the defendant in a photographic lineup, the defendant had already been apprehended. Moreover, Price's and Parker's in-court identification of the defendant as one of the perpetrators was not dependent on the prior photographic lineup. They could identify the defendant because they knew him, albeit briefly. Price and Parker testified that they had spent two days with the defendant planning the armed robbery. They rode in the same car with him, conversed with him, and stayed at a motel with him. Furthermore, Olin's in-court identification of the defendant as a perpetrator was based on a firsthand eyewitness account of the events as they transpired, not a photographic lineup. In fact, according to the testimony of Detective LeBlanc, no photographic lineup was shown to any of the eyewitnesses at the bank.
After a thorough review of the record, we find that the evidence negates any reasonable probability of misidentification and supports the jury's verdict. We are convinced that viewing the evidence in the light most favorable to the state, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of armed robbery.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant argues that he was not given credit for time served. He further argues that the trial court failed to advise him of the two-year prescriptive period for filing for postconviction relief.
The minutes of the sentencing transcript indicate that the defendant was given credit for time served. However, the actual sentencing transcript reflects that he was not given credit for time served or advised on filing for postconviction relief.
As to credit for time served, such an allowance of credit is mandatory. See LSA-C.Cr. P. art. 880. However, the amendment of Article 880 by 1997 La. Acts No. 788, § 1, effective August 15, 1997, rendered the giving of credit for time served automatic, without the necessity or formality of the trial court having to so state. See State v. Jarvis, 98-0522, pp. 6-7 (La.App. 1 Cir. 12/28/98), 727 So.2d 605, 609.
As the issue of filing for postconviction relief has been raised herein, it is apparent that the defendant has notice of the limitation period and has an attorney who is in the position to provide him with such notice. Although we have done so in the past, we decline to remand for the trial court to provide such notice. Instead, out of an abundance of caution and in the interest of judicial economy, we refer the defendant to LSA-C.Cr.P. art. 930.8(A), which generally provides that "[n]o application for postconviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of [LSA-C.Cr.P. arts.] 914 or 922. . . ." See State v. Godbolt, *1075 XXXX-XXXX, pp. 7-8 (La.App. 1 Cir. 11/3/06), 950 So.2d 727, 732.
This assignment of error is without merit.

PRO SE ASSIGNMENTS OF ERROR
In his two interrelated pro se assignments of error, the defendant argues that the trial court imposed an excessive sentence, and that there is no justification to support the great disparity in the sentences of the co-defendants. For the following reasons, we do not reach the merits of these assignments of error.
Defense counsel filed a timely motion to reconsider sentence.[3] The trial court ordered the state to show cause on April 20, 2005, why the defendant's motion should not be granted. On the day of the hearing (April 20), neither the defendant nor his counsel was present. On motion of the state, the trial court ordered that the matter be continued without date.
Nothing in the record indicates a ruling on the motion to reconsider sentence. Although it was defendant's responsibility to obtain a ruling on the motion and to cause the appellate record to be supplemented with it, in its current procedural posture, any action by this court on the defendant's appeal of the length of the sentence would be premature. At any time, the trial court could grant the defendant the relief he seeks on reconsideration of the sentence.
Therefore, we affirm the defendant's conviction, but remand the matter to the trial court for supplementation of the record with the ruling on the defendant's motion to reconsider sentence. If there has been no disposition of the motion, the trial court should rule on it within thirty days of the date of this opinion. If the trial court grants the motion to reconsider and resentences the defendant,[4] the defendant may appeal the new sentence. If the motion is denied, or already has been ruled on, the defendant must move to relodge this appeal within sixty days of the date of the ruling on the motion to reconsider sentence or the date of this opinion, whichever is later. See State v. Maloney, 625 So.2d 748, 751 (La.App. 1 Cir.1993).
CONVICTION AFFIRMED; REMANDED WITH ORDER.
NOTES
[1] Also charged in the bill of information were William Henry Smith, Darryl Price, Milton Lee Livas, Gladys Megale Harris, and Roger Parker, Jr. The only person on trial in the instant matter was the defendant.
[2] In his brief, the defendant states that there is no dispute that a robbery took place at the Bank One or that over $35,000 was taken during the robbery. The defendant maintains, however, that he was not a party to the robbery.
[3] The defendant was sentenced on January 18, 2005. The copy of the motion to reconsider sentence, which includes the signed order setting a show cause hearing, was filed February 11, 2005. See LSA-C.Cr.P. art. 881.1(A)(1).
[4] If the defendant is re-sentenced, we note that the basis for the sentence should be included pursuant to the provisions of LSA-C.Cr.P. art. 894.1 C.