Judge TERRI F. LOVE.
[ iThis appeal arises from the defendant’s conviction of two counts of second degree murder, by non-unanimous verdicts, and his sentence of life imprisonment without the possibility of parole, probation, or suspension of sentence.
We find that sufficient evidence existed such that a trier of fact could have found the defendant guilty beyond a reasonable doubt. We find that the trial court judge’s limitation of the cross-examination of the State’s witness’ criminal history constitutes harmless error. Further, we find that the trial court did not abuse its discretion in denying the defendant’s motion to suppress the identification because adequate evidence exists in the record to comply with the required jurisprudential factors. The trial court also did not err in denying defendant’s motion for new trial because the alleged newly discoverable evidence was discoverable prior to trial. Additionally, the defendant did not preserve the right to challenge a non-unanimous verdict on appeal. Lastly, we find that the defendant’s sentences are not excessive, as they fall within the mandatory sentencing guidelines. Therefore, we affirm.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A grand jury indicted Landon Quinn on two counts of second degree murder in violation of La. R.S. 14:30.1, for the murders of Matthew Miller and Ryan |2McKinley. Mr. Quinn pled not guilty. Following the trial, the jury returned a verdict of guilty as charged on both counts. Mr. Quinn filed a post-trial motion for new trial, which the trial court denied. Mr. Quinn was then sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence. Mr. Quinn objected to the sentence and noticed his intent to appeal. The trial court granted Mr. Quinn’s motion for appeal. The trial court also denied Mr. Quinn’s motion for reconsideration of sentence.

Testimony of Officer Enjoli Harris

First District New Orleans Police Department (“NOPD”) Officer Enjoli Harris and her partner were called to the scene of a shooting at North Prieur Street and Bayou Road in New Orleans on April 14, 2009. Upon her arrival at the crime scene, Officer Harris observed that the victims, two white males, were lying on the ground suffering from gunshot wounds. One of the victims, Mr. Miller, was still responsive, while the other victim, Mr. McKinley, was unresponsive. Officer Harris asked Mr. Miller what happened, and he identified the shooter as a black male. EMS was called to the scene, and the victims were transported to the hospital.

Testimony of Officer Rodney Vicknair

Officer Rodney Vicknair, who was assigned to the NOPD’s First District Task Force, was working with his partner, Officer Armond Clavo. He observed two gentlemen on the ground with gunshot wounds. Officer Vicknair recalled that Mr. McKinley was pale in color, scared, had trouble breathing, and was concerned about his friend, Mr. Miller. Officer Vick-nair asked Mr. McKinley if he knew who shot him and if he could give Officer Vick-nair his address for notification of his next of kin. However, Mr. McKinley could not speak. Mr. McKinley’s shirt was pbloody. No witnesses were observed in the vicinity of the shooting, and no one came to the scene to identify themselves as witnesses.

*323
Testimony of Officer Armond Clavo

Officer Clavo observed two gentlemen on the ground with gunshot wounds. Officer Clavo recalled that the victims were making noise, or yelling that they were shot. Officer Clavo asked Mr. Miller if he knew who shot him, and Mr. Miller stated that a black male shot him and pointed towards North Johnson and Prieur Streets. Mr. Miller indicated that he and the other victim were robbed, and he showed great concern about Mr. McKinley, but Mr. Miller eventually could not speak anymore, he “shut down,” and lost consciousness.
Officer Clavo also explained that on the crime camera footage, the victims were observed with a bag, as if coming from a store, and they were talking to several people on the corner of Governor Nicholls and North Roman Streets. Officer Clavo recognized one of the people the victims were speaking to in the footage. Although Officer Clavo did not remember the person’s name, he knew where the person lived.

Testimony of Detective Ryan Aucoin

Detective Ryan Aucoin was assigned to the NOPD Homicide Division and was “investigating homicides on and off since 2004.” On the night of the shooting, Detective Aucoin reported to the crime scene and identified the location on a map at trial. When Detective Aucoin arrived at the scene, the victims were already transported to the hospital, but he viewed pools of blood on the corner of North Prieur Street and Bayou Road. Detective Aucoin also identified an article of clothing found at the scene, a two-liter pineapple Big Shot soft drink, and a wrapper, which originally contained a roast beef poboy, that was collected at the 1¿scene.
A secondary crime scene was developed in the two thousand block of Barracks Street in between a mosque and a fence. Detective Aucoin stated that this was where the investigating officers surmised the actual shooting took place. No spent bullet casings were found.

Testimony of Detective Michael McCleery

Detective Michael McCleery testified as a witness for the State.[1] Detective McCleery worked in the NOPD’s Homicide Division for five years. Detective McCleery was able to determine where the victims lived and pinpointed at trial the location of the victims’ home from a map. During his investigation, Detective McCleery ascertained that the victims went to Wise Discount Market (“Market”) on Governor Nicholls and North Johnson, purchased a poboy sandwich and a two liter soda, and began to walk home. En route to their home, Mr. Quinn approached the victims from behind.
The Market’s surveillance cameras recorded video that Detective McCleery later retrieved during the investigation. Detective McCleery identified pictures of Mr. McKinley inside the Market with a sandwich and outside of the Market with the sandwich in his hand. Mr. Miller was also visible in this photo. Detective McCleery identified the last photo as depicting Mr. Miller.
Detective McCleery developed Qaid Ali and Zaid Wakil as eye-witnesses to the shootings. He also identified the still photos from the city crime cameras in the *324 vicinity, the video footage from the cameras, and another photo showing Mr. 1 .^Miller standing outside of the Market. Finally, Detective McCleery identified a bullet that was recovered from Mr. McKinley.

Testimony of Dr. Cynthia Gardner

Cynthia Gardner, M.D., was qualified by joint stipulation as an expert in the fields of medicine and forensic pathology. She conducted the autopsy on the victims. Dr. Gardner identified her autopsy protocol of Mr. Miller, and testified that he had a total of two penetrating gunshot wound tracks. One of the gunshots grazed his left upper arm. The second was a penetrating gunshot wound that caused Mr. Miller’s fatal injuries. This wound was fatal, but not immediately fatal. Dr. Gardner opined that after being shot, Mr. Miller would have been able to walk several feet. She also stated that a single bullet could have caused the injuries. No projectiles were recovered from Mr. Miller until he had surgery. Based upon her findings, the shot was a distance range gunshot (more than two feet away) wound because Dr. Gardner did not observe any gunpowder soot or gunpowder stippling, as would be present in a gunshot fired from a closer range.
Dr. Gardner then identified her autopsy protocol of Mr. McKinley, and testified that he also had a total of two penetrating gunshot wound tracks. The first shot was a penetrating gunshot wound to the upper left back and injured Mr. McKinley’s left lung and ribs on the left side and returned to his diaphragm. The second was also a penetrating gunshot wound that caused the fatal injuries. Dr. Gardner recovered the projectiles from Mr. McKinley during the autopsy. Based upon her findings, the shots were also distance range gunshots. Dr. Gardner also identified the bullets recovered from Mr. McKinley. The path of entry of the wounds was consistent with someone who was either hunched over or face down.
| filTestimony of Qaid Ali
Qaid Ali was sitting in his parked and on the phone with his wife on the night of the shootings. He was parked at the mosque on “38 North Johnson”[2] on the Barracks Street side. Mr. Ali recalled that the service was at 9 p.m., but that he was early, as it was about 8:30 p.m. Mr. Ali observed people walking back and forth, and then noticed a man suddenly run past the front of his car with a white t-shirt pulled over his head. The man appeared to be wearing dark clothing. The man ran up to two people on the other side of the street, and then grabbed one of the two people from behind and pulled that person to the ground. From Mr. Ali’s view, the man held a gun on the other person while holding the first person on the ground. Mr. Ali could not see a pistol because the man’s back was to him, but based on the man’s movements, he assumed that the man had a gun. Mr. Ali heard two faint shots, which to him, sounded like a cap gun. Immediately afterwards, the perpetrator ran past Mr. Ali’s car again. The two victims then got up and walked down from the side of the fence towards Bayou Road. Mr. Ali recalled that the perpetrator was dark skinned and had a small build. After the perpetrator fled on foot, Mr. Ali exited his vehicle and headed towards the mosque. Mr. Ali then noticed that someone exited the mosque to inspect their car (presumably for bullet holes). Mr. Ali asked the man if what he had heard were *325 in fact gunshots. The man confirmed that the sounds were actual gunshots. It was at that point Mr. Ali heard someone yelling for help around Bayou Road. Mr. Ali figured that it was the two victims.
| testimony of Zaid Wakil
Zaid Wakil was parked on Barracks Street around 8:30 p.m., waiting for the mosque to open on the night of the shooting. Mr. Wakil recalled seeing a white male walk past his car, and about five minutes later, he saw another white male walk past his car. About five minutes later, Mr. Wakil saw both of the men walking together. However, a man with a t-shirt pulled over his head ran towards the two men and pulled a gun on them. The two men turned around and appeared nervous. Mr. Wakil heard the perpetrator say something like “give it here,” or “give it up.” He heard one of the two victims tell the perpetrator to “calm down” or “be cool,” but the perpetrator continued to point the gun at the victims and robbed them. Mr. Wakil could not see what was taken, but he could see the gun, a black revolver. Mr. Wakil identified the perpetrator as Mr. Quinn in court. Mr. Wakil heard Mr. Quinn fire the gun three times and then Mr. Quinn ran off. The victims checked each other and then staggered down the street. Mr. Wakil did not realize that they were injured, as he assumed that Mr. Quinn only fired shots to scare them.
Mr. Wakil then went into the mosque where he encountered Mr. Ali. He spoke with Mr. Ali about the incident. Both men heard the sirens and saw the lights of emergency vehicles at the end of the street. Mr. Wakil witnessed the aid being rendered to the victims. While the NOPD was investigating the scene, Mr. Wakil indicated that an NOPD officer instructed him to leave the area while the crime scene was being cordoned off. Mr. Wakil observed a second NOPD officer with a flashlight looking for bullet casings. Mr. Wakil told the police officer that he was not going to find bullet casings because the perpetrator used a revolver.
Mr. Wakil then reentered the mosque and prayed. However, when finished | swith the prayer service, one of the NOPD officers was waiting for him. The NOPD officer inquired whether he witnessed the shooting, and Mr. Wakil responded affirmatively. The NOPD officer asked Mr. Wakil if he wanted to speak to the detective. At that time, a bystander to Mr. Wakü’s conversation with the NOPD officer warned him about talking to the police. The bystander warned Mr. Wakil that the perpetrator could come back with a change of clothes and stand in the crowd to observe who was talking to the police. Mr. Wakil then said that he would not talk to the detective at the scene. Instead, Mr. Wakil gave his number to the NOPD officer and requested that the detective phone him.
Mr. Wakil stated that he met with Detective Orlando Matthews at a later date. He was presented with a photographic lineup, selected the photograph of Mr. Quinn as being the perpetrator, and signed the back of the identification.[3]

Testimony of Stanley Woods

The transcript of Stanley Woods’ statement was read in open court because he could not be located. On the night of the shootings, Mr. Woods was in his shotgun double on Barracks Street with his fiancée and his daughter seated in the living room; *326 the front door was opened, but the screened door was closed. He and his family were sitting and talking when he heard two or three gunshots. Mr. Woods paused for a minute then went outside. He observed a couple of white males kneeling by a trailer. Mr. Woods stated that the two men appeared to be trying to get up, and then one of the men shouted that he was shot. Mr. Woods offered to call someone for help. The two men were trying to walk towards North Prieur Street to Esplanade Avenue. Mr. Woods observed that the two men | appeared to be sitting or kneeling on the corner. Mr. Woods did not see the perpetrator or the shooting. Mr. Woods saw Mr. Wakil at the scene talking on a cell phone. Eventually, Mr. Woods and Mr. Wakil spoke and asked one another about what transpired.

Testimony of Detective Orlando Matthews

Detective Matthews interviewed Mr. Wakil. He recalled that Mr. Wakil was able to identify the perpetrator as a black male because he saw the perpetrator’s arms. Mr. Wakil thought that the perpetrator was young because of the way he moved. Mr. Wakil did not offer specific descriptions about the perpetrator’s facial features at that time. The first time Mr. Wakil identified the perpetrator was when Detective MeCleery presented him with the photographic lineup.

ERRORS PATENT

A review of the record for errors patent reveals none.

SUFFICIENCY OF THE EVIDENCE

Mr. Quinn asserts that the evidence was insufficient to support a verdict of guilty beyond a reasonable doubt for two counts of second degree murder because the State failed to prove every element necessary to constitute second degree murder. Mr. Quinn contends that the evidence of his identity in this case was circumstantial because the facts allege that he was in the neighborhood around the same time of the shootings, and only one witness identified him from a photographic lineup.
Generally, when assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, “after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This review must include the whole record, as a rational fact finder does. State v. Mussall, 523 So.2d 1305, 1310 (La.1988). “If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all of the evidence most favorable to the prosecution must be adopted.” Id. “It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence.” State v. Johnson, 619 So.2d 1102, 1109 (La.App. 4th Cir. 1993). “Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder.” State v. Robinson, 10-0885, p. 7 (La.App. 4 Cir. 12/21/10), 54 So.3d 1208, 1213. “Conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency.” State v. Jones, 537 So.2d 1244, 1249 (La.App. 4th Cir.1989). “Like all questions of fact, this determination is entitled to great weight and will not be disturbed unless clearly contrary to the evidence.” Id. “Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’s testimony, if believed by the fact finder, is sufficient to support a *327 factual conclusion.” State v. Marshall, 04-3139, p. 9 (La.11/29/06), 943 So.2d 362, 369.
When misidentification of evidence is alleged as the basis of a sufficiency claim, this Court also reviews the reliability of an identification in accordance with the factors set out Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). State v. Stewart, 04-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639. The Manson test includes the examination of five factors, which are: “(1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; |nand (5) the length of time between the crime and the confrontation.” Id.
The State was required to show that Mr. Quinn was engaged in the perpetration of an armed robbery when the victims were killed. Armed robbery is a general intent crime, and “[i]n general intent crimes, the criminal intent necessary to sustain a conviction is shown by the very doing of the acts which have been declared criminal.” State v. Pleasant, 11-1675, p. 19 (La.App. 4 Cir. 10/17/12), 102 So.3d 247, 257, quoting State v. Arnold, 07-0362, p. 7 (La.App. 1 Cir. 9/19/07), 970 So.2d 1067, 1071-72.
The Manson factors establish that Mr. Wakil’s identification of Mr. Quinn was reliable. First, Mr. Wakil’s testimony indicates that he had an opportunity to view Mr. Quinn at the time of the crime. Second, Mr. Wakil was able to describe the events immediately prior to the shooting, including the direction the victims walked to and from the Market. Third, Mr. Wakil saw Mr. Quinn run toward the victims while wearing a shirt over his head, and could clearly see the portions of Mr. Quinn’s face that were exposed. Fourth, Mr. Wakil witnessed the whole robbery and shooting. Fifth, Mr. Wakil observed Mr. Quinn flee on foot in the same direction as he came after the shootings. Thus, by the time Mr. Wakil identified Mr. Quinn in court, he testified that he witnessed Mr. Quinn commit the aforementioned criminal acts, and he had positively identified Mr. Quinn in a photographic lineup a few days after the shooting. Therefore, we find that when viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Mr. Quinn committed the murders. Therefore, Mr. Quinn’s assertion lacks merit.

LA. C.E. ART. 607(D)(1) & LA. C.E. ART. 609.1

Mr. Quinn asserts that the trial court erred by allegedly denying a full and | unfair opportunity to cross-examine the prosecution witness, Mr. Wakil, regarding pending criminal charges against Mr. Wakil. The State concedes this point, but asserts that the error was harmless in view of the considerable other evidence against Mr. Quinn.
La. C.E. art. 607(D)(1) provides that a party may attack the credibility of a witness by introducing “[e]xtrinsic evidence to show a witness’ bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.” The plain language of La. C.E. art. 609.1 [4] sets forth the general rule that in a criminal case “only offenses for which the witness has been convicted are admissible upon the *328 issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, indictment or a prosecution, or an acquittal.” However, as noted in Authors’ Note 2, La. C.E. art. 609.1, Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law (2007), “[denying an accused the right to cross-examine a state’s witness as to a pending criminal charge in order to show possible bias may deny him not only his right of cross-examination, but also his constitutional right of confrontation.”
The Sixth Amendment guarantees the right of an accused in a criminal prosecution “to be confronted with the witnesses against him.” U.S. Const, amend. VI. “The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.” Davis v. Alaska, 415 U.S. 808, 315-16, 94 S.Ct. 1105, 1110 39 L.Ed.2d 347 (1974), quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940). In addition, La. Const. Art. I, § 16 states, in pertinent part, that “[a]n accused is entitled to confront and cross-examine the 11F,witnesses against him.”
Under La. C.E. art. 608(A), reputation evidence to attack or support a witness’s credibility is limited to references to the witness’s character for truthfulness or untruthfulness. However, as noted in La. C.E. art. 608(B), “[pjarticular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.”
Although only convictions can be used to impeach credibility as a general rule, many cases have held that possible or ongoing prosecutions that have not resulted in a conviction can be used to show bias or interest under La. C.E. art. 607(D)(1). As stated in State v. Vale, 95-1230, 95-0577, p. 4 (La.1/26/96), 666 So.2d 1070, 1072:
This court granted certiorari because the trial court’s ruling, affirmed by the court of appeal, conflicted with numerous decisions by this court that to the extent exposure of a witness’s motivation is a proper and important function of the constitutionally protected right of cross-examination, a witness’s “hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest.” State v. Brady, 381 So.2d 819, 822 (La.1980) (collecting cases); see also State v. Nash, 475 So.2d 752, 755-56 (La.1985).
Thus, alleged criminal conduct which has not resulted in a conviction may be elicited from a witness at trial to show bias or interest.
It is well-settled that “ ‘[a] witness’s bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct.’ ” State v. Burbank, 02-1407, p. 2 (La.4/23/04), 872 So.2d 1049, 1050, quoting Vale, 95-1230, 95-0577, p. 4, 114666 So.2d at 1072. “[A] witness’s ‘hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest.’ ” Vale, 95-1230, 95-0577, p. 4, 666 So.2d at 1072, quoting State v. Brady, 381 So.2d 819, 822 (La.1980). “The possibility that the prosecution may have leverage over a witness due to that witnesses] pending criminal charges is recognized as a valid area of cross-examination.” Burbank, 02-1407, p. 2, 872 So.2d at 1050, quoting State v. Rankin, 465 So.2d 679, 681 (La.1985).
In Burbank, the Louisiana Supreme *329 Court reversed a decision by this Court[5] that found no error in the trial court’s refusal to permit defense counsel to question a prosecution witness concerning the existence and terms of a plea agreement under negotiation in her pending criminal case. Burbank, 02-1407, p. 3, 872 So.2d at 1051. The Louisiana Supreme Court remanded the case to this Court for consideration of whether the trial court error was harmless. Id. On remand, this Court found the error was harmless beyond a reasonable doubt and explained the proper inquiry for a harmless error inquiry as follows:
Sixth Amendment confrontation errors are subject to harmless error analysis. The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination was fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). Factors to be considered by the reviewing court include ‘“the importance of the witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.” Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438; State v. Wille, 559 So.2d 1321, 1332 (La.1990).
State v. Burbank, 01-0831, pp. 3-4 (La.App. 4 Cir. 12/29/04), 893 So.2d 109, 112.
At trial, but before Mr. Wakil testified, the parties met in chambers to discuss Mr. Wakü’s prior convictions. The State acknowledged that Mr. Wakil had a prior 2007 conviction for a misdemeanor obstruction of justice from Virginia, but the trial court determined that the Virginia conviction was not relevant. Mr. Quinn’s counsel disagreed and contended that the obstruction of justice conviction was relevant because it reflected the nature of Mr. Wakil’s credibility. However, the trial court would not allow Mr. Quinn’s counsel to question Mr. Wakil about the obstruction of justice conviction. Mr. Quinn’s counsel objected.
The trial court also found Mr. Wakil’s failure to return a rental vehicle in 2009, which resulted in a conviction, irrelevant. In addition, the trial court omitted other convictions, over Mr. Quinn’s counsel’s objections, which included: felony burglary, theft, and stolen property convictions from Pennsylvania in 1990; receiving stolen property and burglary from Pennsylvania in 1991; a criminal conspiracy felony conviction from Pennsylvania in 1991; a criminal trespass felony from 1991; misdemean- or unauthorized use of a moveable and theft from 1991; and a drug violation from 1995.
The State conceded that Mr. Wakil was recently arrested for violating drug laws in Arizona and acknowledged that Mr. Wakil could possibly face federal charges. The trial court omitted this charge from questioning, over Mr. Quinn’s counsel’s objection. The trial court reconsidered omitting the charge after Mr. Quinn’s counsel asserted that the threat of Mr. Wakü’s prosecution was relevant. The trial court concluded that Mr. Quinn’s counsel could question Mr. Wakil about [1fiany felony convictions, but not about misdemeanor convictions.
Nevertheless, Mr. Quinn contends that the trial court’s limitation of the defense’s cross-examination of Mr. Wakil infringed *330 upon Mr. Quinn’s Sixth Amendment right to confrontation.
The State avers that the limitation on Mr. Quinn’s counsel’s ability to cross-examine Mr. Wakil regarding certain convictions, particularly: (1) the burglary in 1990 from Pennsylvania; (2) the criminal conspiracy in 1991 from Pennsylvania; (3) the burglary in 1991 from Pennsylvania; (4)a drug violation from 1995 in Pennsylvania; and (5) the failure to return a rental vehicle in 2009 from North Carolina, did not adversely affect his Sixth Amendment right to confront the witness. The State further asserts that Mr. Quinn’s counsel was never prevented from asking questions regarding Mr. Wakil’s aforementioned felony convictions. The State maintains that while Mr. Quinn wanted to question Mr. Wakil about all his prior convictions, the right to question Mr. Wakil about prior convictions is not a constitutional right guaranteed by the Confrontation Clause. However, if there was an error, the State contends that such error was harmless.
In the case sub judice, the crucial testimony as to the convictions of Mr. Quinn was Mr. Wakil’s identification of Mr. Quinn, who was armed with a handgun, and who perpetrated the armed robbery of Mr. Miller and Mr. McKinley, which resulted in their deaths. The State presented the testimony of Mr. Wakil, who made both in-court and out-of-court identifications of Mr. Quinn as the shooter.
La. C.E. art. 609.1(A) provides that “[i]n a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations....” Particularly, La. C.E. art. 609.1(B) sets forth the | ^limitations of the cross-examination of witnesses and specifies that “only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.” However, La. C.E. art. 609.1 does not delineate between felonies and misdemeanors. La. C.E. art. 609.1 states that prior convictions are within the ambit of questioning. Thus, for the trial court to limit the cross-examination of Mr. Wakil’s other prior felony convictions constituted error. Therefore, we must determine whether the trial court’s error was harmless.
An error is harmless beyond a reasonable doubt if the verdict “was surely unattributable to such error.” State v. Robertson, 06-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172, quoting State v. Johnson, 94-1379, p. 18 (La.11/27/95), 664 So.2d 94, 102. Considering all of the facts and evidence presented during the trial, we find that the guilty verdicts were unattributable to the trial court’s error of limiting Mr. Quinn’s counsel’s cross-examination of Mr. Wakil regarding whether he had a pending or prior misdemeanor convictions or charges in another jurisdiction. Mr. Quinn’s counsel was able to cross-examine Mr. Wakil on numerous convictions, which Mr. Wakil did not dispute. Therefore, the jury knew Mr. Wakil possessed multiple convictions while he was testifying. Mr. Wakil’s testimony as an eye-witness was crucial to the State’s case, and his testimony was also corroborated by Detective MeCleery. Therefore, we find that Mr. Quinn’s assertions lack merit because the trial court’s error was harmless.

MOTION TO SUPPRESS IDENTIFICATION

Mr. Quinn contends that the trial court erred in denying his Motion to Suppress the Identification.
*331 11sThe law pertaining to the suppression of out-of-court identifications is well-settled:
La. Code of Criminal Procedure art. 703(D) provides that the defendant has the burden of proof on a motion to suppress an out of court statement. To suppress an identification, a defendant must first prove that the identification procedure was suggestive. State v. Prudholm, 446 So.2d 729, 738 (La.1984). An identification procedure is suggestive if, during the procedure, the witness’ attention is unduly focused on the defendant. State v. Robinson, 386 So.2d 1374, 1377 (La.1980). Moreover, a defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that a likelihood of misidentification existed as a result of the identification procedure. State v. Valentine, 570 So.2d 533 (La.App. 4 Cir. 1990).
The Supreme Court has held that even if the identification could be considered suggestive, it is the likelihood of misidentification that violates due process, not merely the suggestive identification procedure. State v. Thibodeaux, 98-1673 (La.9/8/99); 750 So.2d 916, 932. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517. If a suggestive identification procedure has been proved, a reviewing court must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of mis-identification at trial. State v. Martin, 595 So.2d 592, 595 (La.1992). The U.S. Supreme Court has set forth a five-factor test to determine whether a suggestive identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Manson v. Brathwaite, Id. The corrupting effect of the suggestive identification itself must be weighed against these factors. Martin, 595 So.2d at 595.
In evaluating the defendant’s argument, the reviewing court may consider all pertinent evidence l13adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Lewis, 2004-0227 (La.App. 4 Cir. 9/29/04); 885 So.2d 641, 652. A trial court’s determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Offray, 2000-0959 (La.App. 4 Cir. 9/26/01); 797 So.2d 764.
State v. Holmes, 05-1248, pp. 6-7 (La.App. 4 Cir. 5/10/06), 931 So.2d 1157, 1161. A defendant must establish that an identification procedure was suggestive before the court looks to the Manson factors to determine whether to suppress an identification. State v. Lee, 02-2073, p. 4 (La.App. 4 Cir. 1/15/03), 840 So.2d 1, 3, quoting State v. Thibodeaux, 98-1673, p. 20 (La.9/8/99), 750 So.2d 916, 932.
Mr. Quinn argues that Mr. Wakil provided an initial description that the perpetrator was as a black male between 5'10" and 5'11" weighing between 170 and 175 pounds. However, Mr. Quinn argues that *332 Mr. Wakil was unable to specify the individual’s build, describing him as “not heavy, maybe thin, medium build.” Thus, Mr. Wakil, according to Mr. Quinn, was unable to provide a description of the perpetrator’s face and only determined the shooter’s race from a glimpse of the shooter’s arm. Mr. Wakil also assumed and testified that the perpetrator was young based on the shooter’s movements. The other witness at the scene, Mr. Ali, was also shown a photographic lineup, but he failed to make a positive identification of Mr. Quinn.
Since the record does not contain the photographic lineup, the Manson factors must be utilized to determine the identification procedure was suggestive. As mentioned previously, the Manson factors are: “(1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the assailant; (4) thej^level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation.” State v. Nelson, 08-0584, p. 6 (La.App. 4 Cir. 12/17/08), 3 So.3d 57, 61, citing Manson, 432 U.S. 98, 97 S.Ct. at 2253.
Detective McCleery testified during the hearing on the motion to suppress the identification that Mr. Wakil recognized the complexion and facial features, specifically the eyes and nose, of Mr. Quinn when making the identification of the perpetrator. The testimony of Detective McCleery corroborates the testimony of Mr. Wakil wherein Mr. Wakil stated that he was able to identify Mr. Quinn because the perpetrator’s cheekbones, nose, eyes and eyebrows were visible through the neck hole of the shirt that the perpetrator wore on his head. Defense witness, Detective Matthews, testified that when Mr. Wakil made his identification of Mr. Quinn as the perpetrator, Mr. Wakil was able to identify facial features. Furthermore, the location where the victims were shot, as testified to by Mr. Wakil, is corroborated by the video surveillance from camera located on the property of the fencing company, which was presented at trial. Thus, even if the photographic lineup was suggestive, a review of the Manson factors confirms that Mr. Wakil’s identification was reliable. Thus, the trial court did not err in denying the motion to suppress the identification.

MOTION FOR A NEW TRIAL

Mr. Quinn asserts that the trial court erred when it failed to grant the Motion for New Trial based on allegedly newly discovered alibi evidence.
La.C.Cr.P. art. 851 provides, in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the 121 motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
[[Image here]]
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
Thus,
[a] defendant seeking a new trial based on newly discovered evidence must establish four elements: (1) that the new evidence was discovered after trial; (2) that failure to discover the evidence before trial was not attributable to his lack of diligence; (3) that the evidence is *333 material to the issues at trial; and (4) that the evidence is of such a nature that it would probably produce a different verdict in the event of retrial.
State v. Brisban, 00-3437, p. 12 (La.2/26/02), 809 So.2d 923, 931. “ ‘A trial court assessing the legal merits of such a motion is given considerable latitude in evaluating the reliability of the evidence and its impact on the verdict.’ ” State v. Brooks, 98-0693, p. 12 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 820, quoting State v. Payn, 92-0975, p. 4 (La.App. 4 Cir. 7/26/95), 659 So.2d 527, 529. “The trial court has much discretion in ruling on a motion for new trial.” State v. Cureaux, 98-0097, p. 4 (La.App. 4 Cir. 5/26/99), 736 So.2d 318, 321. Review of the trial court’s ruling “is limited to determining whether the trial court abused its discretion.” State v. Labran, 97-2614, p. 6 (La.App. 4 Cir. 5/26/99), 737 So.2d 903, 907.
In the Motion for New Trial, Mr. Quinn alleged that a private investigator (“PI”) hired by his family post-verdict discovered two witnesses, Vincent E. James, II, and Dominque Cosey, who were allegedly with Mr. Quinn at the time of |22the shooting and could provide an alibi. Mr. Quinn avers that Mr. James provided information to the PI about the identification process in this matter, which Mr. Quinn contends is significant to his defense. The other alleged alibi witness, Ms. Cosey, stated that she was with Mr. Quinn at the time of the shootings. Mr. Quinn maintains that the testimony of these two witnesses should result in a new trial or a remand.
The State asserts that the testimony of Mr. James and Ms. Cosey would not constitute new evidence under current legal standards. The State avers that Mr. Quinn made no showing that the alleged newly discovered evidence was not discoverable before or during trial.
The testimony of Mr. James and Ms. Cosey is not newly discovered evidence. In the matter sub judice, Mr. James provided information regarding the alleged investigative methods of the NOPD and alleged that he was with Mr. Quinn at the time of the shootings. Ms. Cosey also alleged that she was with Mr. Quinn. Both witnesses contend that they were sitting with Mr. Quinn on a stoop and heard the gunshots in the vicinity. However, given that Mr. James’ name appears in the police report per the post-trial motions hearing, the information or existence of Mr. James is not new evidence. Additionally, if Ms. Cosey was with Mr. Quinn the night of the shooting, then Mr. Quinn knew Ms. Cosey was a potential alibi witness prior to trial. Hence, the alibi evidence is not new and does not meet the requirements for the granting of new trial.

NON-UNANIMOUS VERDICT

Mr. Quinn asserts that the non-unanimous provisions for a jury verdict in a mandatory life imprisonment without parole case are unconstitutional under the Sixth Amendment to the United States Constitution. Furthermore,
lasMhough there is no single procedure for challenging the constitutionality of a statute, our jurisprudence has established that a statute “must first be questioned in the trial court ..., and the unconstitutionality of a statute must be specially pleaded and the grounds for the claim particularized.” Vallo v. Gayle Oil Co., 94-1238, p. 8 (La.11/30/94), 646 So.2d 859, 864-65 (footnote omitted). These rules have been established so that interested parties are afforded sufficient time to prepare briefs defending the constitutionality of a challenged statute, so that trial courts are provided with complete and thoughtful arguments regarding the issue of constitutionality, and so that re *334 viewing courts have an adequate record upon which to determine the statute’s constitutionality. Istre v. Meche, 00-1316, p. 4 (La.10/17/00), 770 So.2d 776, 779. Raising the constitutionality issue within a motion has been deemed by this court to satisfy these goals. See Vallo, 94-1238, p. 8, 646 So.2d at 865.
State v. Granger, 07-2285, n. 5 (La.5/21/08), 982 So.2d 779, 784. There is no record of Mr. Quinn having filed a pretrial constitutional challenge to La.C.Cr.P. art. 782. Therefore, we pretermit this issue on appeal because Mr. Quinn is prohibited from raising the issue on appeal.

EXCESSIVE SENTENCE

Mr. Quinn contends that the mandatory life imprisonment without parole sentence is unconstitutionally excessive under the Eight Amendment to the United States Constitution. The trial court noted an objection to the sentence immediately after imposing the sentence and noted an objection to the alleged excessive nature of the sentence. Mr. Quinn preserved the issue for appellate review by stating his intention to file a motion for reconsideration of sentence at that time.
La. Const, art. I, § 20 explicitly prohibits excessive sentences. State v. Baxley, 94-2982, p. 4, (La.5/22/95), 656 So.2d 973, 977. “ ‘A punishment is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain l^and suffering and is grossly out of proportion to the severity of the crime.’ ” State v. Dorthey, 623 So.2d 1276, 1280 (La.1993), quoting State v. Scott, 593 So.2d 704, 711 (La.App. 4th Cir. 1991). “[C]ourts have the power to declare a sentence excessive under Article I, Section 20 of the Louisiana Constitution, although it falls within the statutory limits provided by the Legislature.” State v. Johnson, 97-1906, p. 6 (La.3/4/98), 709 So.2d 672, 676. “ ‘When a trial judge determines a sentence from a carefully tailored penalty statute,’ ” such as the statute applicable in the instant case, La. R.S. 14:64, “ ‘there is a strong presumption that the sentence is within constitutional parameters.’ ” State v. Bunley, 00-0405, p. 24 (La.App. 4 Cir. 12/12/01), 805 So.2d 292, 308, quoting State v. Guy, 95-0899, p. 14 (La.App. 4 Cir. 1/31/96), 669 So.2d 517, 526.
“ ‘Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.Code Crim. Proc. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case.’ ” State v. Robinson, 98-1606, p. 12 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 127, quoting State v. Anderson, 97-2587, p. 10 (La.App. 4 Cir. 11/18/98), 728 So.2d 14, 20. If there is “adequate compliance with the Article 894.1,” “the reviewing court must determine whether the sentence is [sic] imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.” State v. Ross, 98-0283, p. 8 (La.App. 4 Cir. 9/8/99), 743 So.2d 757, 762.
Mr. Quinn was charged with two counts of second degree murder, violations of La. R.S. 14:30.1(B), which provides that “[w]hoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without [^benefit of parole, probation, or suspension of sentence.” The trial court sentenced Mr. Quinn to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
This Court has affirmed life imprisonment without benefits for second degree murder. See State v. Robinson, 01-1305, *335 pp. 16-17 (La.App. 4 Cir. 4/17/02), 820 So.2d 571, 582; State v. Jenkins, 98-2772, p. 6 (La.App. 4 Cir. 8/15/00), 759 So.2d 861, 865.
Mr. Quinn avers that he was convicted on “weak circumstantial evidence.” He further contends that the evidence introduced at trial indicated that he was at the Market with other individuals around the time the shootings occurred. Mr. Quinn maintains that the identity of the perpetrator is not discernible from the security video. Hence, Mr. Quinn challenges the accuracy of the identification provided by the witnesses. Mr. Quinn also avers that he had no prior felony convictions, and as such, “the sentence is disproportionate and serves no meaningful sentencing goals.” He concludes that since the imposed sentence eliminates any possibility of rehabilitation, the sentences should be declared unconstitutionally excessive.
Mr. Quinn’s life sentence for second degree murder is mandatory pursuant to La. R.S 14:30.1(B). This Court has reiterated the Supreme Court’s requirements for a defendant to overcome the mandatory sentencing requirements for a successful challenge to an excessiveness claim as follows:
There is only one way that a defendant can rebut the presumption that a mandatory minimum sentence imposed by the legislature is constitutional. The defendant must show that “because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, |?Bthe gravity of the offense, and the circumstances of the case.” State v. Lindsey, 99-3256, 99-3302, p. 5 (La.10/17/00), 770 So.2d 339, 343.
State v. Albert, 04-2098, p. 7 (La.App. 4 Cir. 7/27/05), 914 So.2d 574, 578, quoting State v. Allen, 03-2156, p. 14 (La.App. 4 Cir. 5/19/04), 876 So.2d 122, 131. In the case sub judice, there are no anomalies, or exceptional circumstances presented in Mr. Quinn’s conviction and sentencing warranting any reduction of the imposed life sentence. He is not a juvenile, nor has he been charged with the rape of a minor, nor is he incompetent. Mr. Quinn was convicted of two counts of second degree murder. The evidence presented at trial was sufficient to convict Mr. Quinn, the eyewitness’ identification was reliable and corroborated, and his alleged newly discovered alibi evidence was proven to be discoverable prior to trial. At the sentencing, the trial court stated that it was required by law to impose a mandatory life sentence without benefit of probation, parole, or suspension of sentence. Furthermore, Mr. Quinn presented no evidence or testimony at the sentencing to demonstrate that his sentences should deviate from the legislatively mandated sentence of life imprisonment, other than the fact that he had no prior felonies.
Accordingly, we find that the trial court properly applied the statutory provisions contained in La.C.Cr.P. art. 894.1, and did not abuse its discretion in imposing the statutorily mandated life sentence.

DECREE

For the above-mentioned reasons, we affirm the conviction and sentence of Mr. Quinn. We find that sufficient evidence existed such that a trier of fact could have found the defendant guilty beyond a reasonable doubt. We find that the trial court’s limitation of the cross-examination of the State’s witness’ criminal history | ^constitutes harmless error. Further, we find that the trial court did not abuse its discretion in denying the defendant’s motion to suppress the identification because adequate evidence exists in the record to comply with the required jurisprudential factors. The trial court also did not err in *336 denying defendant’s motion for new trial because the alleged newly discoverable evidence was discoverable prior to trial. Additionally, the non-unanimous verdicts are not unconstitutional. Lastly, we find that the defendant’s sentences are not excessive, as they fall within the mandatory sentencing guidelines. Therefore, we affirm.
AFFIRMED.

. A stipulation was offered by the State and accepted by the defense that Officer Leary would be qualified as an expert in the field of firearms examination. The stipulation further provided that if Officer Leary were called to testify, he would state that he examined the bullets recovered from the victims and determined that they were all fired from the same weapon.

. The address of the mosque is 1238 North Johnson Street. This is a typographical error by the stenographer in the transcript.

. During his cross-examination Mr. Wakil’s credibility was attacked. He was confronted with several prior convictions dating back to 1990, including his failure to return a rental vehicle, burglary, drug violations, receiving stolen property, and criminal conspiracy. Mr. Wakil did not dispute his past convictions.

. La. C.E. art. 609.1(B) provides, “Generally, only offenses for which the witness has been convicted are admissible upon the issue of credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, a prosecution, or an acquittal.”

. State v. Burbank, 01-0831 (La.App. 4 Cir. 2/27/02), 811 So.2d 1112.