# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 20-605


**STATE OF LOUISIANA**

**VERSUS**

**FREDDY LEE WILLIAMS**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 78004
HONORABLE STEPHEN BRUCE BEASLEY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**SHANNON J. GREMILLION**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Shannon J. Gremillion, Van H. Kyzar, and Sharon D. Wilson, Judges.


**CONVICTION AND SENTENCE AFFIRMED.**

**Mary Constance Hanes**
**Louisiana Appellate Project**
**P.O. Box 4015**
**New Orleans, LA 70178-4015**
**(504) 866-6652**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Freddy Lee Williams**

**Don M. Burkett**
**Eleventh Judicial District Attorney**
**Anna L. Garcie**
**Assistant District Attorney**
**P. O. Box 1557**
**Many, LA 71449**
**(318) 256-6246**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**GREMILLION, Judge.**

On May 28, 2018, the victim, Garrick Gosey, suffered a broken neck and paralysis after Defendant, Freddy Lee Williams, chased him, grabbed him, and then fell on top of him.  On March 22, 2019, Defendant was charged by bill of information with one count of second degree battery, a violation of La.R.S. 14:34.1.[1]  After a two-day jury trial, Defendant was found guilty as charged of second degree battery.  Subsequently, the trial court denied Defendant's "Motion for Post-Verdict Judgment of Acquittal or Alternatively Motion for New Trial" and sentenced Defendant to six years at hard labor.  Thereafter, the trial court denied a motion to reconsider sentence filed by Defendant.

Defendant now appeals alleging three assignments of error:

1.  There is insufficient evidence to support Freddy Lee Williams's conviction for second degree battery; the State failed to prove that Mr. Williams had the intent to inflict serious bodily injury on Garrick Gosey, as the injury occurred when Mr. Williams accidentally fell on top of him;

2.  The trial court abused its discretion in denying the defense's motion for mistrial after the police detective, a prosecution witness, commented that Mr. Williams's girlfriend had a case against him; and

3.  The prosecutor, in closing argument, relied on facts not in evidence, *i.e.*, information the jury heard during voir dire from a prospective juror regarding the safety policy at the defendant's place of employment; the improper comments and argument influenced the jury and contributed to the verdict, resulting in the denial of a fair trial.

Defendant challenges the sufficiency of the evidence as to his intent to inflict serious bodily injury on the victim and challenges the trial court's rulings on two objections made during trial.  For the following reasons, Defendant's conviction and sentence are affirmed.

---

[1] Defendant was originally charged with aggravated second degree battery, a violation of La.R.S. 14:34.7.

# ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

Louisiana Code of Criminal Procedure Article 873 requires a minimum twenty-four-hour delay between the denial of a motion for new trial or motion in arrest of judgment and sentencing unless there is an express waiver of the delay. Defendant's Motion for Post-Verdict Judgment of Acquittal or Alternative Motion for New Trial was denied immediately prior to the commencement of sentencing:

In *State v. Dawson*, 19-1612, pp. 17-19 (La.App. 1 Cir. 11/17/20), 316 So.3d 77, 89-91, *writ denied*, 21-217 (La. 5/4/21), 315 So.3d 222, the first circuit held:

> This court has conducted an independent review of the entire record in this matter, including a review for error under La. C.Cr.P. art. 920(2). Our review has revealed the existence of a patent sentencing error in this case.
>
> Defendant filed a motion for new trial, and the trial court denied it on the day of sentencing, just prior to the imposition of sentence. Louisiana Code of Criminal Procedure article 873 mandates, in pertinent part, that "[i]f a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled, . . . [unless] the defendant expressly waives a delay[.]" There is no indication in the record defendant waived the twenty-four hour delay for sentencing. Herein, the trial court erred by sentencing defendant immediately after ruling on the motion for new trial. While defense counsel did not contest moving on to sentencing immediately following the denials of his motion for new trial, in *State v. Kisack*, 2016-0797 (La. 10/18/17), 236 So. 3d 1201, 1205 (*per curiam*), *cert. denied*, ___ U.S. ___, 138 S. Ct. 1175, 200 L.Ed. 2d 322 (2018), the supreme court found the defense counsel's participation in the sentencing hearing was insufficient to constitute a waiver of the delay required by Article 873. As observed by the court, "[a]n implicit waiver . . . runs afoul of the plain language of Art. 873 that requires that the waiver be expressly made." *Id.*
>
> Nevertheless, in *State v. Augustine,* 555 So.2d 1331, 1333-34 (La. 1990), the Louisiana Supreme Court indicated that a failure to observe the twenty-four hour delay provided in Article 873 will be considered harmless error where defendant cannot show that he suffered prejudice from the violation, and sentencing is not challenged

on appeal. *See State v. White,* 404 So. 2d 1202, 1204-05 (La. 1981). *See also State v. Carter,* 2014-0742 (La. App. 1st Cir. 3/25/15), 167 So. 3d 970, 979 (observing that "[a]s a general rule, when a defendant challenges a non-mandatory sentence, and the delay is not waived, the defendant's sentence must be vacated and the matter remanded for resentencing"). Defendant has raised no challenge to the sentences imposed on appeal.

. . . .

. . . [D]efendant does not raise his sentencing as an issue on appeal, and, therefore, does not show any prejudice by his procedurally improper sentencing. Accordingly, any error in the trial court's failure to observe the twenty-four hour delay is harmless beyond a reasonable doubt and does not require a remand for resentencing. *State v. McIntosh,* 2018-0768 (La. App. 1st Cir. 2/28/19), 275 So.3d 1, 8, *writ denied,* 2019-00734 (La. 10/21/19), 280 So. 3d 1175.

As in *Dawson*, Defendant does not challenge his sentence on appeal and thus does not show prejudice by the failure to observe the mandatory time delay. Accordingly, the error is harmless.

## ASSIGNMENT OF ERROR NUMBER ONE

Defendant claims the evidence was insufficient to prove he specifically intended to inflict serious bodily injury on the victim. Defendant contends that a rational jury would have found him not guilty or guilty of the lesser offense of simple battery.

The standard for reviewing sufficiency of the evidence is set forth below:

When the issue of sufficiency of evidence is raised on appeal, the reviewing court determines whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). Discretion in determinations of credibility is vested in the jury, which may accept or reject testimony within the bounds of rationality, and we will only impinge upon its discretion "to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall*, 523 So.2d at 1310. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *State v. Ryan*, 07-504, p. 2 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268,

3

1270 (quoting *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727).

> However, the *Jackson* standard "does not permit the reviewing court to view just the evidence most favorable to the prosecution and then to decide whether that evidence convinced it beyond a reasonable doubt." *Mussall*, 523 So.2d at 1310. "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *State v. Allen*, 36,180, p. 5 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, 626, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).

> *State v. Thomas*, 17-959, pp. 13-14 (La.App. 3 Cir. 9/26/18), 255 So.3d 1189, 1199, *writs denied*, 18-1757, 18-1662 (La. 4/22/19), 268 So.3d 294, 303.

*State v. Trosclair*, 19-833, p. 2 (La.App. 3 Cir. 6/24/20), 299 So.3d 704, 707-08, *writ denied*, 20-949 (La. 1/20/21), 308 So.3d 1162.

Officer Benjamin Shaw testified that he received a call from the Sabine Medical Center on May 28, 2018. The caller informed Officer Shaw that a person with injuries had been dropped off at the hospital. When Officer Shaw contacted the victim at the hospital, the victim stated that he was in a lot of pain. The victim told Officer Shaw that Defendant hit him in the back of the neck and that he could not feel his legs.

Officer Shaw made contact with Defendant approximately five hours later at around 2:00 a.m. at the Sabine Parish Sheriff's Office. Defendant told Officer Shaw that he went looking for the victim because he believed the victim took his weed eater. No further information had been received, Officer Shaw testified, regarding the theft of the weed eater. Defendant told Officer Shaw that the victim wanted to fight and that the victim swung a pellet gun at him. Defendant also told Officer Shaw that he caught the pellet gun with his right hand, and Officer Shaw confirmed

4

a bruise on Defendant's hand. When asked what Defendant said happened next, Officer Shaw testified:

> A.     Well, when he caught – you know, when he caught the pellet gun, he said Mr. Gosey just turned around and ran away from him. He said he went to chase him. He said Mr. Gosey fell into a ditch and he said he fell on top of him. And he said as soon as he fell on top of him, he heard Mr. Gosey say his legs were hurting. So, they loaded him in a truck and took him to the hospital.

Officer Shaw clarified that Defendant told him that his girlfriend, Fanny White,[2] took the victim to the hospital. When shown State's Exhibit 1, the arrest report, Officer Shaw testified that Defendant was described as 6'6" tall and weighing 260 pounds.

On cross-examination, Officer Shaw testified that the victim had no visible injuries when the officer saw him at 9:20 p.m. Officer Shaw testified that the victim told him he was hit in the back of the neck and that he could not feel his legs.

After being allowed to refresh his memory by reading Defendant's statement, Officer Shaw agreed that Defendant told the officer that he had things taken from his yard. Additionally, Officer Shaw remembered that Defendant told him that the victim had previously asked Defendant if he wanted to sell a riding lawn mower and a weed eater. Defendant also told Officer Shaw that he saw the victim leaving his yard about 11:30 p.m. one night when Defendant arrived home from work. When Defendant discovered his weed eater was missing, he went around town asking if anyone had seen it. Defendant told Officer Shaw that someone told him they saw the victim leaving Defendant's yard.

---

[2]White's first name is spelled "Fannie" in some parts of the transcript and "Fanny" in other parts.

Officer Shaw further remembered from reading Defendant's statement that on May 29th, Defendant saw the victim walking with a pellet gun around his neck.[3] According to his statement, Defendant approached the victim to ask him if he had seen Defendant's weed eater, and the first thing out of the victim's mouth was "I don't want to fight you." Before he knew it, Defendant stated, the victim swung the pellet gun at him and threw it. Defendant further explained that the victim ran, and Defendant ran behind him and fell on top of him. Officer Shaw acknowledged that Defendant said nothing about a ditch in his statement but testified that Defendant told him that he fell into a ditch.

Phillip Cutrer, a detective with the Many Police Department, interviewed the victim approximately one month after the incident when the victim was stable enough to be interviewed. The video of the interview was played for the jury. During the interview, the victim was lying in his hospital bed. The victim told Detective Cutrer that Defendant chased him and grabbed him by the neck. The victim stated that he fell, and Defendant started hitting him with something. According to the victim, his whole body went numb. The victim did not see anything in Defendant's hands and could not tell if Defendant was hitting him with an object. Since the victim had a pellet gun with him and dropped the gun when he fell, the victim thought Defendant hit him with the pellet gun. The victim stated, however, that he did not see Defendant with the pellet gun. According to the victim, his body went numb after the last blow. Finally, the victim told Detective Cutrer that he fell down, but Defendant did not knock him down.

According to Detective Cutrer's testimony at trial, the victim did not mention in the interview that he fell in a ditch. After the interview, Detective Cutrer went to

---

[3] The State referenced the date of May 29, 2018, which appears to have been a misstatement. According to the bill of information, the date of the offense is May 28, 2018.

the property where the incident took place. While there, the owner of the property, Frank Manning, took the detective to the spot where he saw the victim lying. Detective Cutrer described the area as flat where Manning indicated the victim was lying. The detective videoed Manning's yard, and the video was shown to the jury without sound. According to Detective Cutrer, the video showed the distance from the road to the spot where Manning saw the victim. Based upon what the victim told him and his own observation of the yard in which the incident happened, Detective Cutrer estimated the victim's body was moved about thirty-eight feet.

Regarding previous incidents in which Defendant complained of offenses committed against him, Detective Cutrer testified that on April 7, 2017, Defendant complained that money was taken out of his bank account without his permission. On December 1, 2017, Defendant complained to police about damage to his car windshield, and on May 23, 2019, Defendant complained that someone had taken his dog.

On cross-examination, Detective Cutrer testified that the victim initially told him his injuries were caused by a fall followed by Defendant hitting him with what the victim believed was an object. The victim, Detective Cutrer testified, did not believe hands alone would have caused his injuries. The following colloquy then occurred between Detective Cutrer and defense counsel:

Q. Okay. So, basically, what you're saying today is first Mr. Gosey said it was a fall, correct?

A. Yes, sir.

Q. Okay. And then another time Mr. Gosey said he was hit with something, correct?

A. He said he believed that.

Q. He believed that.

A. Yes, sir.

7

Q.    Okay. What did he say he believed that he was hit with?

A.    He said that he could not see. It was dark.

Q.    Did Mr. Gosey ever indicate to you that Mr. Williams hit him with multiple blows?

A.    Can you repeat that?

Q.    Mr. Gosey told you – one time you told me that Mr. Gosey told you that he fell down, correct?

A.    Yes, sir.

Q.    Okay. And you told me that Mr. Gosey also at another time in his statement told you that Mr. Williams hit him with something, correct?

A.    He believed that. Yes, sir.

Q.    Okay. Mr. Gosey also told you that he believed that [Defendant] hit him with a pellet gun, correct?

A.    No, sir.

Q.    Did Mr. Gosey tell you that he believed [Defendant] hit him with multiple blows?

A.    Yes, sir.

Q.    Did Mr. Williams – he did?

A.    Yes, sir.

Q.    Did Mr. Gosey tell you – Mr. Gosey did – Mr. Gosey told you that [Defendant] hit him with a last blow and that's what made him numb, correct?

A.    Yes, sir.

Q.    Okay. So Mr. Gosey told you multiple things as to how this injury occurred, correct?

A.    Yes, sir.

Q.    Yes. From a fall to a – "I was hit multiple times," to "I was hit with a pellet gun," correct?

A.    That was all part of the interview. Yes, sir.

8

Q.     All right.  Then Mr. Gosey also told you, if I'm not mistaken, that [Defendant] grabbed him by the neck and threw him down, correct?

A.     Yes, sir.

Q.     Okay.  So Mr. Gosey told you about five or six different stories as to how this injury occurred, correct, in that interview?

A.     In that story, yes, sir.

Q.     All right.  And one of those was that he admitted that he fell down, correct?

A.     He said that "they" fell down.  Yes, sir.

Q.     Do you remember asking Mr. Gosey, "And you fell down, he didn't knock you down?"  You remember that, correct?

A.     Yes, sir.  It's in the interview.

Q.     Right.  And you remember Mr. Gosey's response was, "I had fell down."  That was his response, correct?

A.     Yes, sir.

Q.     And you specifically asked him did [Defendant] knock him down, correct?

A.     Yes, sir.

Q.     I think you already said that Mr. Gosey admitted that he never saw [Defendant] with any type of – well, he didn't see [Defendant] with an object, correct?

A.     Yes, sir.

Q.     Even though at one point in time he told you that [Defendant] hit him with an object, correct?

A.     He said he believe [sic] he hit him with something.

Q.     He believed he hit him with –

A.     Yes, sir.

Q.     - right.  But he admitted he never saw [Defendant] with an object, correct?

A.     Yes, sir.

9

Q. Mr. Gosey, as you've already said, he – as you've already said he told you multiple allegations about him being beaten or hit with an object. You admit that he told you those multiple allegations, correct?

A. Well, he told me a story of the event that happened.

Detective Cutrer testified that when he saw the victim, the victim looked injured and had a suction tube in his neck. When defense counsel asked the detective to agree that the victim did not have any outward injuries, Detective Cutrer responded, "Other than not being able to move, no."

On re-direct, the State and Detective Cutrer had the following colloquy:

Q. Now, Mr. Conday asked you and we all watched the interview of Mr. Gosey at the hospital, he didn't tell you – Mr. Conday saying "he told you five different things," that – would that be a correct characterization of what Mr. Gosey did that day?

A. He just told me a story –

Q. About what happened.

A. - one story. Yes, ma'am.

Q. One story. And so the things that were told – and Mr. Conday asked you, "The first thing that Mr. Gosey said when you asked him what happened?" "Grabbed me," grabbed him by his neck and he went down. And it was after he was down that he said he was struck in the back, correct?

A. Yes, ma'am.

Dr. Brian Willis, an expert in the field of neurosurgery, testified that he was a professor of neurosurgery in the Department of Surgery at the Ochsner LSU Medical Center in Shreveport. Additionally, Dr. Willis stated that he was the Chief of the Neurosurgery Section at Overton Brooks VA. In May of 2018, Dr. Willis was the victim's attending physician.

When the victim was admitted to the hospital, it appeared that his only significant injury was a broken neck. Specifically, Dr. Willis testified that the victim had three fractured vertebrae. The victim underwent surgery to remove the pressure

10

on his spinal cord and to perform a stabilization procedure using small screws and rods. When describing the victim's injury, Dr. Willis testified:

> He has what we call "spinal cord complete" from the lower neck down, meaning he had no sensation and no movement of his legs. He had preservation of function in the upper extremities, but the proximal muscles, we call it, the shoulders, the upper arms worked much better. They weren't normal, but they were closer to normal. But he had very severe deficits in his hands, which is usually at the lowest part of the cervical spine.

When asked what type of force would be necessary to cause the victim's injuries, Dr. Willis testified:

> A. Of this particular type of cervical spine injury, it would take a fair – a fairly significant force to make this occur.
>
> Q. Okay. Now, would fractures in the neck themselves be – cause these injuries?
>
> A. Not necessarily. Often times, these particular bones that were fractured can be fractured in car accidents, and they frequently are, and people come in neurologically normal. And they require nothing more than just a collar and observation, and usually within a couple of weeks they're back at work.
>
> But the – it's not just the fracture alone. It's the force that causes the fracture also caused the kind of squeezing or twisting of the spinal cord itself, and that's what caused the neurologic injury.

Due to the paralysis in his chest muscles, Dr. Willis testified, the victim had to be put on a ventilator in the intensive care unit.

When asked if there were any abrasions noted on the victim's body, Dr. Willis responded:

> And I have no recollection of that, nor do any of my records reflect it, but reading over the medical records, I did note that one ER physician noted an abrasion to the head. It was no more specific than that. And another note, another day or so later, someone noted abrasions to his chest and shoulder.

Finally, Dr. Willis testified that in his medical opinion, the victim suffered serious bodily injury.

11

On cross-examination, Dr. Willis acknowledged that the victim's medical records indicate he was "normocephalic." According to Dr. Willis, "normocephalic" means the outside of the head is considered a "normal head." When defense counsel asked if "normocephalic" indicated a lack of blows to the head, Dr. Willis answered:

A.    Yeah. That – it probably would. If there was a lot of blows [sic] that delivered [sic] to the head and the face, they would not have said normocephalic. They would have said multiple contusions, abrasions, swelling in the face, and then probably describe that in detail.

. . . .

Q.    Okay. So you can rule out that Mr. Gosey was hit with many blows, correct?

A.    I would think so.

Q.    Okay. If an individual was hit with a gun with enough force to break a neck, would your records reflect that an individual was normocephalic?

A.    It may say normocephalic, but it would be likely something I would document and note on my operative – you know, when I'm doing a surgery and I'm exposing the back of the neck. And if I saw a lot of swelling or contusion or bruising, it would be something I would make note of.

Q.    Okay. So if that's not made note, any swelling or bruising or contusions or [sic] not in your medical records, that would mean Mr. Gosey did not present with any swelling, bruising, or contusions on the 29th, correct?

A.    Correct.

Q.    Which was a day after the incident, correct?

A.    Correct.

Q.    If an individual – in your opinion, the amount of force required to – for this injury to be a result, would that leave swelling or bruising or breaks in the skin or something bleeding, something of that nature?

A.    Not necessarily. It would not have to have any external features, depending on how the mechanism of force was delivered.

Q.    Okay. But if the mechanism of force was delivered with a pellet gun or with many blows, then you would - - it would require – or you would probably see swelling and things of that nature, contusions.

A.      That's correct.  I think that the force that would require for a pellet gun striking a back of a neck to break the neck and cause a spinal cord injury would leave a considerable amount of bruising.

. . . .

Q.      If a person – if in your medical records it said when the patient arrived to you all, okay, to your hospital, did the medical records reflect that the patient has no obvious injuries, can you explain that to me –

. . . .

A.      - I think they're making a reference to no obvious external injuries.  Not – obviously, he had internal injuries - -

Q.      Right.

A.      - that we could see on a CAT scan.

Q.      Right.  But when they initially saw him, no obvious injuries –

A.      That's right.

Q.      - no external, obvious injuries.

A.      Other than we did make mention of an abrasion to a head –

Q.      Right.

A.      - that was rather nonspecific, and then later an abrasion to a shoulder or a back.

When asked what could cause an abrasion that is not significant, Dr. Willis responded, "[a] fall can, a tussle, somebody getting in a fight, putting in a headlock, a chokehold, any of those could cause an abrasion."  According to Dr. Willis, a superficial injury is an injury that is on the surface of the skin.  Dr. Willis agreed that the medical records from LSU indicated the abrasion on the victim's chest was superficial.

As for the type of incident that would cause injuries like those suffered by the victim, Dr. Willis testified that such injuries could be caused by "a very forceful fall as we had discussed perhaps somebody falling on top of him, in addition to [the

13

victim] falling." The following colloquy then took place between Dr. Willis and defense counsel:

> Q. Okay. But somebody – possibly if the individual fell down and, I don't know, fell down awkwardly and then somebody fell on top of them, that would cause enough force –
>
> A. It could.
>
> Q. - for this injury.
>
> A. It absolutely could.
>
> Q. All right. That's plausible, isn't it?
>
> A. Plausible.

Dr. Willis agreed that when the medical records say, "Patient Cause of Injury, patient hit by gun or hit in the neck," these words came from the patient and were not the doctor's diagnosis.

> On re-direct, the following colloquy took place:
>
> Q. Let's talk about, though, you talked about something about a choke hold or a tackle. Let's talk about why a choke hold or a tackle could cause these – the kind of injuries that Mr. Gosey sustained.
>
> A. Okay.
>
> Q. Tell me about the mechanism, what a chokehold or tackle would do to the body to cause –
>
> A. You would just have to envision that you would have to have someone in such – in such a condition or a position that you imply [sic] many pounds of force to a neck at an abnormal angle to make the fractures occur and then to twist or squeeze the spinal cord and cause a spinal cord injury, but I'm trying to imply simple, say running and tripping and falling is probably not going to be sufficient. But if someone was tackled around the neck and brought down, or if someone fell on top of somebody who had already fallen, that might be significant enough to produce that type of injury.
>
> Q. Like if they were being chased and went down and somebody went down on top of them, that's a possibility.
>
> A. That's a possibility.

14

Manning also testified as to what he heard and saw outside of his house on the night of the incident. After hearing a noise outside of his house, Manning looked out of the bathroom window and saw a set of legs on the ground. According to Manning, the ground was flat. Manning went outside and saw the victim lying on the ground. He did not see anyone else around, and the victim told him he could not move his legs. While Manning was bent down asking the victim what happened, he looked up and saw Defendant standing five or six feet in front of him. Defendant accused the victim of being in his yard, and the victim denied the accusation. Manning said he was going to call the police and went inside to get the phone. When Manning went back outside, the victim was getting into a car. Manning did not see how the victim got into the car, but he thought Defendant took him. Manning identified Defendant in the courtroom. Finally, Manning testified that he saw a gun, something like a rifle or BB gun, on the ground, but the gun was gone when he returned with the phone.

Christopher Horton testified that on the night in question, he was walking home when he saw the victim lying on the ground by Manning's house. Horton described the area where the victim was lying as "kind of off the road or wherever." Horton stated that he would not disagree if someone testified that there was about thirty-eight feet between the road and Manning's house. According to Horton, the victim was lying on the ground, shaking his head from side to side, and asking for help because he could not feel his legs. Horton testified that the only people present were himself, the victim, and Defendant, who Horton identified in court.

Horton described his relationship with both the victim and Defendant as "Tight. Friends. Cool." When asked why he did not come forward, Horton replied that he did not want to have any part of it. The following colloquy took place between Horton and the State:

Q.     Okay.  Well, let's talk about that, because you actually did have a part of it, didn't you?

A.     Yes, ma'am.

Q.     Okay.  So when you got there, you said that you saw Garrick Gosey lying on the ground, asking for help.

A.     Yes, ma'am.

Q.     What was –

A.     I mean, yes, ma'am.

Q.     – what was [Defendant] doing?

A.     He was standing behind me.  And he said – he told me to help him get him in the car.

Q.     Okay.  Not call the – not call 911?  Not –

A.     Not that I know of.

Q.     Well, do you remember him saying, "We need to call an ambulance," or "We need to call 911"?

A.     No, ma'am.

Q.     Okay.  So how did y'all get him the 38 feet from where he was lying to the car?

A.     We picked him up and put him in the car.

Q.     Tell me how you picked him up.

A.     Um, somebody had his legs and somebody – one of us had behind, you know, in the shoulders or whatever.

Q.     Well, who had what?  Who had – there were only two of you, so –

A.     I had his – I had his legs.

Q.     Okay.  So [Defendant] picked him up.  Mr. Gosey couldn't get up, could he?

A.     No, ma'am.

Horton testified that he left after they put the victim in the car but saw

Defendant at Defendant's house about five minutes later.  According to Horton,

16

Defendant said he was going to take the victim to the hospital but instead went to his own house.

On cross-examination, Horton testified that Defendant's house was about two or three blocks from Manning's house. Horton agreed with defense counsel that when he got to Defendant's house, Defendant told him that he was getting ready to take the victim to the hospital. Horton also agreed that Defendant asked for help to get the victim in his car rather than leaving the victim lying there.

On re-direct, when the State asked him who picked up the pellet gun, Horton stated that he did not see a pellet gun. Horton did not know if Defendant left immediately after the victim was put in the car. According to Horton, he left before Defendant drove off in the car, and he did not see Defendant go back into Manning's yard for anything.

Sherry Miex, the victim's mother, testified that White called her on May 28, 2018, to tell her that the victim was in the hospital. Miex went to the Sabine Medical Center where the victim stayed about five or six hours. Miex said she did not see Defendant at the hospital that night. The victim was taken to LSU by helicopter and underwent surgery. He was in ICU for about three or four days, according to Miex. The victim was put in a regular room for about a-day-and-a-half but had to return to ICU when he got sick. At the end of June 2018, the victim was released to Willis Knighton rehabilitation center, where he stayed for about two months. Since the victim's return home, Miex testified that she has been his caretaker.

The final witness to testify was the victim, Garrick Gosey. Gosey testified that he was forty-five years old and had three prior misdemeanor convictions – possession of marijuana, resisting an officer, and angling without a license. Regarding the night in question, the victim testified that he was walking home from his friend's house, and he was carrying a pellet gun. The victim said that he carried

the pellet gun for squirrel hunting. Because Defendant's house was on his way home, the victim walked by Defendant's house. According to the victim, White stopped him near the turn to Defendant's house. The victim testified that he talked with White for a few seconds and did not leave the roadway.

The victim testified that when he finished talking with White, he saw Defendant getting out of his truck. When Defendant saw the victim, however, Defendant got back into his truck and drove around the block. The victim testified that he saw Defendant again about a-block-and-a-half away from Defendant's house. This time, the victim said Defendant was driving a blue Charger. The following colloquy then took place:

> A.   When he pulled up on me on Day Street, he got out of his car, and he told me, "What are you doing at my house?"
>
> And I was, like, "Freddy, I wadn't [*sic*] at your house," you know.
>
> So, when he started coming at me, I turned around to get ready to run, and that's when everything happened, after that.
>
> Q.   Well, tell me what happened.
>
> A.   When I ran, he caught me. And then –
>
> Q.   Well, tell me how he caught you. Where did he catch you?
>
> A.   On the back of my shirt.
>
> Q.   And what –
>
> A.   Back behind Mr. Frank and them house. Frank.
>
> Q.   - okay. So when he grabbed you, what happened?
>
> A.   I don't too much remember nothing after that. No. Nuh-uh (Answering audibly and negatively). I just realizing I wadn't [sic] – I couldn't walk.
>
> Q.   Okay. How far did you run before you went down?
>
> A.   Probably, from here to the wall right there.

. . . .

Q. And that's when he caught you?

A. Yes, ma'am.

Q. Did you ever hit him with your pellet gun?

A. No, ma'am. I had the gun tucked under my arm, running with it.

Q. Okay. And so, you've never said that he hit you with a gun, did you?

A. No.

When asked if he remembered seeing Manning on the night in question, the victim testified:

A. Yes, sir. He – he came out. He told me to hold on. He was about to call 911. I told him, "Please don't leave me," you know, but he went in the house and – to call 911. And Chris was coming up the road, and he grabbed me – well, not Chris, Freddy grabbed me. I was begging Chris not to put me in the car, but they put me in the car. He took me to his house to confront me in front of 'Nett White –

Q. Is that Fannie White?

A. - Fannie White. Fannie White.

The victim estimated that he was at Defendant's house for about thirty minutes. The victim testified that he begged them to take him to the hospital. According to the victim, Defendant asked the victim if he was going to call the police. The victim stated that Defendant then dragged him from the car to a truck and threw him in the truck. White, the victim testified, took him to the hospital.

When asked what parts of his body he could not move, the victim testified that he could not use his hands or legs. The victim also stated that he has to use a catheter to urinate.

The victim identified Defendant in court and testified that he did not steal anything from Defendant. The victim denied that Defendant asked him anything about a weed eater on the night of the incident.

19

On cross-examination, the victim testified that he remembered speaking with Detective Cutrer at the hospital. The victim testified that he initially told the detective that Defendant hit him "with something in the back of [his] head and [his] neck. After being given his previous statement to refresh his memory, the following colloquy ensued:

Q. All right. So, Mr. Gosey, I just showed you a transcript of your statement. And you initially told Mr. Cutrer that you tried to run –

A. Um-hm (Responding audibly and affirmatively).

Q. - and that he grabbed you by your neck and you fell down. Now, do you remember that?

A. And my shirt, part of my neck.

Q. That's not the question I'm asking.

A. But, yeah.

Q. I know today you're saying your shirt.

A. Yeah.

Q. But that day you initially said he grabbed you by your neck and you fell down, correct?

A. As I can remember, yeah.

Q. Okay. Also, that initial statement, do you recall – and I'll come back and show it to you if I have to – you told the detective that he started hitting you or his – "He started hitting me with something, and then my whole body went numb from the waist down"?

A. Yes.

Q. Okay. I know in direct earlier today you answered a question by the district attorney, and you said that you never said that Mr. Williams hit you with a gun. Do you remember that?

A. Yeah.

Q. Okay. Do you recall in your initial interview, the detective asked you, "Do you believe he hit you with anything?" And then you responded, "I really think so." Do you remember that?

A Yeah.

Q.     Okay.  Do you remember the detective asking you, "You think so?" just to make sure that he was hearing this correctly?

A.     Uh-hm (Responding audibly and affirmatively).

Q.     Okay.  And then you went on to say, "Yeah.  I don't think he hit" you "with his hand, but I think he did.  I think it was the gun.  I had a little pellet gun with me."  Do you remember that?

A.     It's been a while.

After defense counsel showed the victim his previous statement to refresh his memory, the following colloquy ensued:

Q.     So again, Mr. Gosey, I've shown you the statement to recollect your memory of your statement you made to Mr. Cutrer.

A.     Um-hm (Responding audibly and affirmatively).

Q.     And I think now – are you indicating to me that you indeed say that – you indeed said that you don't think he hit you with his hand –

A.     But –

Q.     - you think it was the gun?

A.     - whatever it was, he hit me multiple times in the back of the neck.

Q.     But Mr. Gosey my – I'll get to that.  We're going to get to that.

A.     Okay.

Q.     But my question as of right now, it's simply I'm asking did you say to Detective Cutrer –

A.     Okay.

Q.     - that you think it was a gun that he hit you with?

A.     Yeah.

Q.     Okay.  And then early on direct today, you answered that you never said that Mr. Williams hit you with a gun.

A.     Okay.

Q.     Do you remember that?

21

A.    Today?

Q.    Yes. You just said it on direct when the district attorney asked you the question.

A.    Well, like I said, he hit me multiple times in the back of my neck.

Q.    Do you remember also in that statement that you gave to Detective Cutrer that you said that you didn't see anything in Freddy's hands that he might have hit you with?

A.    It was dark. It was – it was about dark. I mean, it was behind. I couldn't see – I couldn't see nothing.

Q.    Okay.

A.    I mean, like I said, whatever it was, I got hit multiple times in the back of the neck.

        . . . .

Q.    Okay. So, you're representing to the Court that Mr. Williams hit you multiple times with something and that's what caused this injury?

A.    Yes.

When defense counsel asked the victim if he remembered Detective Cutrer asking him whether he fell or whether he was knocked down, the victim replied, "He grabbed me." After defense counsel showed the victim his previous statement in order to refresh his memory, the following colloquy occurred:

Q.    Now that I have recollected – or you refreshed your memory, Mr. Gosey, I'm going to ask the question again: Do you remember when the detective asked you, "Did Mr. Williams knock you down?" Do you remember that?

A.    Yeah.

Q.    Do you remember your answer was, "I had fell down"?

A.    After he grabbed me.

Q.    Was that the answer that you just read?

A.    It's been – no. It's just been so long.

Q.    I understand, but I'm asking you –

22

A.    No.  You don't understand.

Q.    - was that the answer that you just read?  I'm asking –

A.    Yeah.

Q.    - you specifically –

A.    Yeah.

Q.    - so you're indicating that you did – when the detective asked you that question on that day, you did reply – when the detective asked you, "Did Mr. Williams knock you down?"  You replied you fell down, correct?

A.    Yeah.

Finally, the following colloquy occurred during the State's redirect of the victim:

Q.    We saw earlier your videotaped statement that you gave to Phillip Cutrer when he went to the hospital.  In that, when he asked you to tell what happened, do you remember telling him what you've told us that you were grabbed from behind and that's when you fell?

A.    Yes, ma'am.

Q.    Okay.  So to be very clear, did you trip and fall down or did you fall after you were grabbed?

A.    I fell after I was grabbed.

Q.    Okay.  And you never saw anything in Mr. Williams' hand?

A.    No, ma'am.

Q.    And you told the officer that you didn't know what it was because it was dark - -

A.    No, ma'am.

Q.    - and you – correct?

A.    Yes, ma'am.

## DISCUSSION

Conceding that the victim suffered serious bodily injury, Defendant contends the State failed to prove that he had the specific intent to inflict that injury upon the

23

victim. Defendant argues that the victim told multiple and conflicting stories about how his neck was injured and that the victim's various claims as to how he was injured were refuted by the medical expert.

Defendant contends that since there was no evidence that he tackled the victim around the neck and no evidence that he deliberately fell on top of the victim, the only possible explanation for the victim's injury was that Defendant accidentally fell on the victim after the victim fell. Defendant notes that this was the explanation given by Defendant to police. Additionally, Defendant notes that he did not inflict any injuries upon the victim when the victim was sitting helplessly in Defendant's car. This fact, Defendant argues, reveals his lack of specific intent to inflict serious bodily injury.

Defendant asks this court to reverse his conviction for second degree battery, or, alternatively, enter a responsive verdict for simple battery. According to Defendant, "[i]f the State proved any crime at all, it was that Mr. Williams committed a simple battery by grabbing Mr. Gosey from behind, causing him to fall and sustain minor injuries." Appellate counsel cites several cases wherein this court and the supreme court have vacated a conviction for second degree battery and entered a judgment of simple battery. See *State v. Vidaurri*, 05-742 (La.App. 3 Cir. 12/30/05), 919 So.2d 803, *writ denied*, 06-573 (La. 10/27/06), 939 So.2d 1270; *State v. Touchet*, 04-1027 (La.App. 3 Cir. 3/9/05), 897 So.2d 900; and *State v. Helou*, 02-2302 (La. 10/23/03), 857 So.2d 1024. However, these cases are not applicable because the courts in these cases found the evidence was insufficient to find the victims suffered serious bodily injuries, not that the evidence was insufficient as to each defendant's specific intent.

Second degree battery is defined as "a battery [committed] when the offender intentionally inflicts serious bodily injury . . . ." La.R.S. 14:34.1(A).

24

The term "serious bodily injury" is defined as follows:

C. For purposes of this Title, "serious bodily injury" means bodily injury which involves unconsciousness; extreme physical pain; protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

La.R.S. 14:2.[4] Defendant does not contest that the victim suffered serious bodily injury. Defendant argues, however, that the evidence was not sufficient to prove he specifically intended to cause the victim's injury. The jurisprudence has interpreted the crime of second degree battery as a specific intent crime: "Second degree battery is a specific intent crime and therefore, the evidence must show that the defendant intended to inflict serious bodily injury." *State v. Broadway*, 53,105, p. 7 (La.App. 2 Cir. 1/15/20), 288 So.3d 903, 908, *writ denied*, 20-372 (La. 7/24/20), 299 So.3d 78.

In support of his claim that the victim's injuries were accidental, Defendant attempts to discredit the victim's statement and testimony regarding the incident. Defendant claims the jury was presented with multiple and conflicting versions of how the victim was injured. The victim's statements and testimony regarding the incident are not significantly inconsistent. In both his statement to Detective Cutrer and in his testimony at trial, the victim said that he ran when Defendant approached him. Although the victim initially told Detective Cutrer that Defendant grabbed his neck, while at trial said Defendant grabbed the back of his shirt, the victim consistently stated that he fell after being grabbed by Defendant. In his statement to Detective Cutrer, the victim stated that Defendant started hitting him after he fell, at which time his body went numb. The victim told Detective Cutrer that he could not

---

[4]At the time Defendant committed the offense, this definition of serious bodily injury was contained in La.R.S. 14:34.1(B)(3). In 2019, the legislature moved the definition to the general definition statute—La.R.S. 14:2—in order to provide a universal definition of serious bodily injury. 2019 La. Acts No. 2, § 3.

tell what Defendant was hitting him with but *thought* it might have been the pellet gun the victim had been carrying. At trial, however, the victim testified that he never said Defendant hit him with a gun. Although defense counsel focused on pointing out this "inconsistency" to the jury, the victim's testimony at trial was not inconsistent with his statement to Detective Cutrer. The victim told the detective that he did not see what Defendant hit him with but *thought* it might have been the pellet gun. This was not inconsistent with his statement at trial that he never said Defendant hit him with a gun.

Defendant also attempts to discredit the victim's statement by arguing that it was inconsistent with Dr. Willis' testimony. Both in his statement to Detective Cutrer and in his trial testimony, the victim stated that he was hit multiple times by Defendant. At trial, defense counsel asked the victim, "So, you're representing to the Court that Mr. Williams hit you multiple times with something and that's what caused this injury." The victim replied, "Yes." As appellate counsel argues, this is inconsistent with the expert's opinion as to the cause of the victim's injury. Dr. Willis opined that the victim did not receive multiple blows since no significant contusions, abrasions, or swelling were present on the victim. If being hit with a pellet gun was the cause of the injury, Dr. Willis opined, considerable bruising would have been observed on the victim's neck.

Despite the inconsistency between the victim's statement about multiple blows and Dr. Willis' testimony, other parts of the victim's testimony were consistent with Dr. Willis' testimony. In fact, the versions given by both the victim and Defendant support Dr. Willis' opinion that the victim's injury was caused by a forceful fall with someone falling on top of him. Additionally, the victim's statement about being grabbed by the neck or shirt supports Dr. Willis' opinion that the injuries could have been caused by the victim being tackled around the neck and

26

brought down. Dr. Willis also stated that the insignificant abrasions seen on the victim's shoulder, chest, and back could have been caused by a fall, a tussle, or a chokehold. It is well-settled that "[t]he trier of fact is free to accept or reject, in whole or in part, the testimony of any witness." *State v. Acker*, 12-1116, p. 15 (La.App. 3 Cir. 4/3/13), 111 So.3d 535, 547 (citing *State v. Arnold*, 07-362 (La.App. 1 Cir. 9/19/07), 970 So.2d 1067, *writ denied*, 07-2088 (La. 3/7/08), 977 So.2d 904). The jury in the present case clearly chose to believe the consistencies between the victim's testimony and Dr. Willis' testimony. Even though Dr. Willis opined that multiple blows did not cause the victim's injury, the jury could have believed the victim received blows that were not significant enough to cause bruising and swelling.

Furthermore, the jury weighed the victim's testimony against the version of events relayed by Defendant to Officer Shaw. Defendant told Officer Shaw that he chased the victim, the victim fell in a ditch, and Defendant fell on top of him. The owner of the yard in which the incident took place, however, described the yard as flat. No other evidence of a ditch was presented to the jury.

It is clear the jury found Defendant specifically intended to seriously injure the victim despite Defendant's claim that he did not.

> Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Jackson,* [51,575 (La.App. 2 Cir. 9/27/17), 244 So.3d 764]. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of this determination is to be guided by the standards of *Jackson v. Virginia*, [433 U.S. 307, 99 S.Ct. 2781 (1979)]; *State v. Jackson, supra.*

*Broadway*, 288 So.3d at 908-09.

27

According to the jurisprudence, specific intent to cause serious bodily injury "may be inferred from the extent and severity of the victim's injuries." *State v. Hager*, 13-546, p. 6 (La.App. 5 Cir. 12/27/13), 131 So.3d 1090, 1093. The victim in the present case suffered three fractured vertebrae, for which he underwent surgery. According to Dr. Willis, even after surgery, the victim had no sensation or movement in his legs and had severe deficits in his hands. While in the hospital, Defendant had to be put on a ventilator because his chest muscles were paralyzed. As Dr. Willis testified, the victim suffered serious bodily injury.

The size of a defendant has also been considered in determining specific intent to inflict serious bodily injury. *State v. Diaz*, 612 So.2d 1019 (La.App. 2 Cir. 1993). Defendant in the present case was described as being 6'6" tall and weighing 260 pounds. According to medical records introduced into evidence, the victim was 6'5" and 185 pounds. In *Diaz*, the court considered Diaz' height and weight to decide in favor of specific intent to inflict serious bodily injury despite the fact that Diaz hit the victim only one time:

> Defendant is between 6' and 6'1″ tall. He testified that at the time of the fight he weighed between 238 and 240 pounds and was on a weight training regimen. He further testified that he struck someone in the face as hard as he could. Although the record does not disclose the victim's height and weight, the trial judge's emphasis of defendant's size indicates that he perceived a disparity in the sizes of the defendant and the victim. Indeed, in oral argument, defendant's counsel stated to this court that the victim weighed approximately 185 pounds.

> Given the facts of this case, we do not think it was unreasonable for the trial court to conclude that when Diaz struck Bullock as hard as he could he intended to inflict serious bodily harm. Indeed, the Louisiana Supreme Court has held that "[w]hen a much stronger man hits a younger, smaller man, the fact finder could rationally conclude that the offender intended to cause, at a minimum, unconsciousness and/or extreme physical pain." [*State v.*] *Fuller,* [414 So.2d. 306], 310 [(La.1982)]. See also *State v. Mullins,* 537 So.2d 386 (La.App. 4th Cir.1988).

> Defendant makes much of the fact that he only struck the victim once, failed to knock the victim to the floor or render him unconscious,

and did not pursue the victim after striking him. These factors, argues defendant, indicate an absence of intent to cause serious bodily harm. We do not agree. The supreme court has firmly rejected the notion that the second degree battery statute envisions an offender who mercilessly beats a fallen victim. *Fuller,* supra. The statute clearly states that the intended harm is "serious bodily injury" and defines this to involve, among other things, unconsciousness, extreme physical pain or protracted and obvious disfigurement. Under the circumstances of this case, when Diaz struck Bullock as hard as he could, he intended to cause serious bodily injury as contemplated by the statute. See *State v. Accardo,* 466 So.2d 549 (La.App. 5th Cir.1985) (statutory requirements met where single blow to victim's head merely caused swelling and a stunned reaction).

*Diaz*, 612 So.2d at 1022. Although Defendant's size could have been considered by the jury in the present case to find Defendant had specific intent to inflict serious bodily injury, appellate counsel argues that the weight of Defendant's body falling on top of the victim caused the injury. Nonetheless, the difference in size between Defendant and the victim could have been a factor considered by the jury to determine Defendant's specific intent to inflict serious bodily injury.

Another factor considered by the jurisprudence as indicative of specific intent to inflict serious bodily injury is the failure to take the victim to the hospital. *See State v. Jackson*, 53,497 (La.App. 2 Cir. 5/20/20), 296 So.3d 1156. In *State v. Scheanette*, 51,851, pp. 7-8 (La.App. 2 Cir. 2/28/18), 246 So.3d 718, 723 (citation omitted), the second circuit mentioned the defendant's failure to take the victim to the hospital and ultimately found specific intent to inflict serious bodily injury despite the defendant's claim that he struck the victim only once:

> As to second degree battery, Ms. McDonald testified that while she was driving, defendant punched her in the face under her right eye. Defendant struck Ms. McDonald hard enough to split her skin open, causing her to bleed profusely. Ms. McDonald had to get four or five stitches, and the area under her eye was bruised and swollen the next day. The injury caused "extreme physical pain" and resulted in a permanent scar on Ms. McDonald's face. The manner in which defendant hit Ms. McDonald, the severity of her injury, and defendant's actions in refusing to take Ms. McDonald to the hospital, together with his statement that he was going to take her to the woods to kill her, all

29

support a finding that defendant intended to inflict serious bodily injury.

Although the victim in the present case was eventually taken to the hospital by Defendant's girlfriend, the victim had been begging Defendant to take him to the hospital for at least thirty minutes.

Considering the circumstances surrounding the victim's injury in this case, the jury's finding of specific intent was rational. By his own testimony, Defendant was upset with the victim because he believed the victim took his weed eater. Defendant then purposely sought out the victim to confront him. When the victim ran, Defendant chased him. Defendant grabbed the victim and either tackled him to the ground or fell on top of him. Even after the victim was lying on the ground and said he could not move his legs, Defendant continued to accuse him of being in his yard. Additionally, Defendant did not call 911 and thwarted Manning's efforts to call for help by moving the victim when Manning went inside to call police. After dragging the victim approximately thirty-eight feet and placing the victim in his car, Defendant stopped by his house to confront the victim in front of White for approximately thirty minutes. Despite the victim's pleas to take him to the hospital, Defendant chose to move the victim yet again before having White finally take the victim to the hospital.

Considering the above, the jury's determination that Defendant possessed the requisite specific intent in the present case was rational. Accordingly, this assignment of error lacks merit.

### ASSIGNMENT OF ERROR NUMBER TWO

Defendant next contends the trial court abused its discretion when it denied his motion for mistrial regarding a statement made by Detective Cutrer. While being questioned by the State, Detective Cutrer stated that Defendant and White have had

30

"prior cases against each other." Defendant argues that since Detective Cutrer is a police officer, the jury would have necessarily assumed the detective was referring to criminal cases. Moreover, since the cases involved his girlfriend, Defendant contends the jury would have also assumed the cases involved domestic battery. In its reply, the State contends there was no abuse of discretion in the trial court's denial of the motion for mistrial since the testimony was not intentionally elicited by the State, the statement was made without any further elaboration, and the trial court admonished the jury to disregard the comment.

During the State's questioning of Detective Cutrer, the State asked the detective if he had been able to locate White. Detective Cutrer replied, "No, ma'am[,]" but stated that he had looked for her. When asked if he knew why he had not been able to contact her, Detective Cutrer answered, "She has outstanding warrants." In its next question, the State asked how the detective knew White was affiliated with Defendant, and the detective responded, "Oh, they've been seen together, and, I mean, they have prior cases against each other and stuff. Everybody knows they're together."

Defense counsel immediately asked to approach the bench and made the following objection:

> Your Honor, well, the basis of my objection is the fact that Mr. Cutrer and Mr. – Ms. Garcie asked a question and Mr. Cutrer answered it that brought in my client's prior activities or prior possibly criminal activity – possible bad acts.

> Your Honor, at this moment in time, the jury has heard that. I don't think it's any way to unring that bell. I think this case should be a mistrial at this moment in time. He has been prejudiced. They cannot ask my client about anything regarding his character or regarding a conviction or anything of that nature or his criminal activity or past criminal acts or bad acts unless he gets on the stand and they cross-examine him about his conviction or unless they file some sort of Prieur motion before court, before the trial, in order to try to get some type of prior bad acts in, Your Honor.

This case has been tainted. At this moment in time, I don't think there's any way that we can unring that bell.

In response, the State noted that the detective did not say Defendant had been arrested or convicted of any crime. When the State pointed out that the detective's statement was not responsive to the question asked, defense counsel argued Detective Cutrer should have known better:

> Your Honor, but the officer is a trained officer. He should know better than to answer that question that "they have prior cases against one another." He specifically said "prior cases against one another." That's – that would indicate to the jury that my client has prior cases. Now the jury's going to be considering what those cases are, "Has this guy been in trouble before?" "Why does he have prior cases with Fanny White?" And now, the jury's going to think about that and they're going to consider that in the decision that they make today. And it's not going to be based on the direct evidence, which what it should be based on.
>
> The only way his prior character or prior cases would have gotten into this court today or would have been admissible is if we would have put his good character at issue. We didn't do that. We were not going to do that. He wasn't going to testify. We wasn't going to say anything about his good character for the purpose of keeping it out so that the jury wouldn't be tainted and knowing that Mr. Williams had prior cases, Your Honor.
>
> I don't know how we can fix this. We can't.

The trial court noted Defendant's objection and "reluctantly" denied the motion for mistrial. The trial court stated that in its opinion, Detective Cutrer was attempting to get that information in, and it would declare a mistrial if the detective stepped over the line. After recessing for a few minutes, the trial court noted that there had been some argument in chambers. Defense counsel explained that he had asked the trial court to reconsider its ruling:

> That's correct, Your Honor. I was asking you to reconsider your ruling based on the fact that this case is a Second Degree Battery case. The officer testified as to the relationship or that Mr. Freddy Williams and Ms. Fanny White knew one another. Obviously, Ms. Fanny White is a female and the officer made a comment about the fact that they have cases against one another.

So, I think any logical mind – I think they jury is going to take that into consideration and probably understand that they have cases against one another, and a police officer or a detective, this individual that make [sic] that comment, that I'm sure is a criminal case, that it's probably a case dealing with domestic abuse battery.

. . . . And I think that the jury knows now that my client had cases where a female made accusations against him, they're going to connect that – they're going to connect there's a domestic abuse battery, and they're going to use that to make a decision – their decision in this trial whether or not Mr. Freddy Williams acted in conformity with how he acted with Ms. Williams [*sic*]. And they're going to probably find him or want to find him guilty based on those statements, Your Honor.

I know the Court wants to admonish or could admonish the jury, but I don't think that would unring the bell. I don't think that would take away whatever prejudicial effect that my client now has.

Responding to an argument apparently made by the State in chambers that a mistrial was not warranted since the statement was not made by a court official, defense counsel cited *State v. Douglas*, 389 So.2d 1263 (La.1980), for the proposition that a mistrial may be warranted if the statement was made by an experienced police officer and it should have been anticipated by the State. Since the State had access to police reports showing that White and Defendant had been charged with fighting one another, defense counsel argued the prosecutor should have anticipated such a response when it asked Detective Cutrer about dealings between White and Defendant.

In response, the State argued that Detective Cutrer's statement was not a direct or indirect reference to other crimes since the detective did not say "criminal cases," "arrests," or "convictions." The State argued that in order for a mistrial to be mandatory, the comment must have been made by a judge, district attorney, or court official and must have unmistakably referred to another crime. According to the State, if someone other than a court official makes an improper reference, an admonition would be appropriate. Defense counsel reiterated that even though Detective Cutrer was not a court official, he was an experienced police officer, and

33

the State should have anticipated his comment. Thus, Defendant argued that a mistrial should be declared.

The following colloquy then took place regarding the prosecutor's discussions with Detective Cutrer prior to his testimony:

> **THE COURT:** Did you let Detective Cutrer know before he testified that he was not to go anywhere near any convictions or anything else?
>
> (Speaking to Witness-Detective Cutrer) Because I think you had prior notice, at least you knew before you got on the stand today, I believe.
>
> (Speaking to Ms. Garcie) You can correct me if I'm mistaken, that this defendant more likely than not was not going to testify, and that none of this could come in. Did you talk to him about that?
>
> **[PROSECUTION]:** We did talk about that, Your Honor, and –
>
> **THE COURT:** And so, he went ahead and mentioned this anyway.
>
> **[PROSECUTION]:** - and my – when I asked him the questions, we had specifically talked about an event where he had encountered Ms. White with Mr. Williams at Walmart. That's – and I have that in my outline. We had gone over that and we talked about –
>
> **THE COURT:** So this detective knew not to bring up any convictions or any cases involving this defendant. Is that what you're telling me? You told him that and then he did it anyway?
>
> **[PROSECUTION]:** I told him we were not going to talk about convictions or cases –
>
> . . . .
>
> **THE COURT:** - because you didn't cover – you didn't say the word "cases," then you feel like he thought it was okay to talk about cases.
>
> **[PROSECUTION]:** No, sir. I'm not saying what I think he thought was okay to talk about. It shouldn't have been said.
>
> **THE COURT:** Yes.

34

The trial court ruled that it would admonish the jury and noted defense counsel's objection. The trial court gave the jury the following admonishment:

> Before Ms. Garcie resumes questioning, I want to admonish the jury that – regarding Detective Cutrer's last statement. Before the jury was taken out, he mentioned cases against one another relating to Mr. Williams and Ms. White. I am admonishing the jury to ignore that comment. You are not to consider that in your deliberations in any way, shape, or form.

Louisiana Code of Criminal Procedure Article 770 states the following regarding the circumstances under which a mistrial must be ordered:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> . . . .
>
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
>
> . . . .
>
> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

A mandatory admonition and permissible mistrial, on the other hand, are provided for in La.Code Crim.P. art. 771:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
>
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

Since the remark in the present case was not made by the judge, district attorney, or a court official, an admonition, rather than a mistrial, was required, unless the trial court found an admonition was not sufficient to assure the defendant a fair trial. La.Code Crim.P. art. 771. Recently, this court addressed whether a mistrial should have been granted when a detective testified as to the defendant's purchase of narcotics:

Defendant next asserts that the trial court erred when it did not grant a mistrial upon Detective Cammack testifying as to "other crimes evidence" allegedly committed by Defendant. More specifically, during the trial, Detective Cammack was asked by the representative of the State if he questioned Defendant regarding whether she had any information concerning the victim, Lachney. Detective Cammack responded "Yes", and then proceeded to state "[Defendant] said they got up the next morning early. She said they went and purchased . . . to Echo and purchased some crystal meth." Defense counsel objected and moved for a mistrial. Although the motion for mistrial was denied, the trial court did admonish the jury to disregard the statement.

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

. . . .

(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

La.Code Crim.P. art. 770.

Defendant concedes that the statement was not made by the judge, district attorney, or court official so as to warrant a mandatory mistrial pursuant to the code. *Id.* Louisiana Code Criminal Procedure Article 771(2) provides that when a remark or comment is "made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770[,]" the trial court shall admonish the jury to disregard the remark when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or

36

the state, in the mind of the jury. This applies to such comments on other crimes evidence by law enforcement officers. "In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial." *Id.*

> An investigating officer is a witness, but is closely related to the district attorney in presentation of the prosecutor's case. Therefore, a prejudicial remark by an experienced police officer should be viewed with considerable concern as to the fairness of the trial, and may require granting a mistrial, especially if the remark was precipitated by or should have been anticipated by the district attorney. Nevertheless, the decision as to the necessity of granting a mistrial in these circumstances was left to the sound discretion of the trial court. See *State v. Madison*, 345 So.2d 485 (La.1977); *State v. Brown*, 322 So.2d 211 (La.1975); *State v. Schwartz*, 354 So.2d 1332 (La.1978). The present case does not reveal a manifest abuse of discretion warranting the substitution of our judgment for that of the trial judge who conducted the trial, heard the remark, and was in the best position to assess its impact.

*State v. Douglas*, 389 So.2d 1263, 1266 (La.1980).

> In this case, we find no error in the trial court's decision to admonish the jury to disregard the statement rather than grant a mistrial. The statement clearly fell under the umbrella of La.Code Crim.P. art. 771's discretionary mistrial provisions. We find no abuse of that discretion here.

*State v. Rabalais*, 20-303, pp. 29-31 (La.App. 3 Cir. 4/7/21) (unpublished opinion).[5]

Likewise, the reference to "cases" made by Detective Cutrer in the present case clearly fell within the umbrella of La.Code Crim.P. art. 771's discretionary mistrial provisions. Considering the vagueness of Detective Cutrer's reference to "cases" between Defendant and White, the trial court did not abuse its discretion in deciding to admonish the jury rather than grant a mistrial.

For the foregoing reasons, this assignment of error lacks merit.

---

[5]This case is cited at 2021 WL 1295020.

## ASSIGNMENT OF ERROR NUMBER THREE

Defendant alleges that comments made by the State in its closing argument were improper as the comments relayed facts the State learned during voir dire. Defendant argues the trial court erred in failing to strike the comments or admonish the jury not to consider them. Claiming the comments deprived him of a fair trial, Defendant asks this court to vacate his conviction and remand for a new trial. In response, the State argues the comments were not substantive in nature and do not require reversal.

During the State's closing argument, the following statement was made by the prosecutor:

> We also know that Freddy Williams should have known if somebody's hurt, you call for help. And I tell you that because I asked Officer Shaw, "Where did Freddy Williams work?" He said, "Boise Cascade." I don't know if you remember, there was a juror, Mr. Harrell, and I specifically asked him, he said he worked at Boise Cascade. I said, "Do y'all have safety meetings?"
>
> "Yes."
>
> "How often?"
>
> He said monthly.
>
> "What are y'all taught to do if somebody's hurt?"
>
> "Call 911."
>
> So, if he'd gotten that information from no other source, he would have gotten it from the people who employ him or employed him.

After the State spoke a few more sentences, defense counsel asked if he could approach the bench. Defense counsel informed the trial court that the prosecutor's comments about Boise Cascade were not in evidence but had been learned by the State during voir dire. Thus, defense counsel asked the trial court to strike the

comments from the record and to admonish the jurors not to consider them. When

the trial court asked the State if it had any response, the following colloquy ensued:

> **[PROSECUTION]:** Well, this is all argument. And all the jurors were present, just like we talked about – just like we talked about things in opening statements, Your Honor.

> **MR. CONDAY:** But things in opening statement are things that you are going to present – evidence you're going to present in your closing argument. It's evidence that has been presented, not things that are not in evidence.

> **THE COURT:** I'm just going to instruct you, Ms. Garcie, please don't discuss anything that's not in evidence.

Louisiana Code of Criminal Procedure Article 774 states the following

regarding the scope of closing argument:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.

> The argument shall not appeal to prejudice.

> The state's rebuttal shall be confined to answering the argument of the defendant.

Since Defendant did not ask for a mistrial but asked the trial court to strike the

comments from the record and admonish the jury not to consider them, La.Code

Crim.P. art. 771 provides as follows:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or

> . . . .

> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

Although the trial court did not specifically admonish the jury to not consider these particular comments, in its general closing instructions to the jury, the trial court told the jurors that the statements of the assistant district attorney and the defense counsel were not to be considered as evidence.

The supreme court has stated the following regarding closing arguments and the appropriateness of reversing a conviction based on improper argument:

> As a general matter, closing arguments in criminal cases "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case." La.C.Cr.P. art. 774. Louisiana jurisprudence on prosecutorial misconduct allows prosecutors considerable latitude in choosing closing argument tactics. The trial judge has wide discretion in controlling the scope of closing argument. *State v. Prestridge*, 399 So.2d 564, 580 (La. 1981). Even if the prosecutor exceeds these bounds, a reviewing court will not reverse a conviction due to an improper remark during closing argument unless the court is ***thoroughly convinced*** the argument influenced the jury and contributed to the verdict, "as much credit should be accorded the good sense and fairmindedness of jurors who have seen the evidence and heard the arguments, and have been instructed repeatedly by the trial judge that arguments of counsel are not evidence." *State v. Martin*, 93–0285, p. 18 (La. 10/17/94), 645 So.2d 190, 200; *see State v. Jarman*, 445 So.2d 1184, 1188 (La. 1984); *State v. Dupre*, 408 So.2d 1229, 1234 (La. 1982).

*State v. Reed*, 14-1980, p. 32 (La. 9/7/16), 200 So.3d 291, 315, *reh'g granted in part on other grounds*, 14-1980 (La. 10/19/16), 213 So.3d 384, *cert. denied*, __ U.S. __, 137 S.Ct. 787 (2017).

We find it unlikely that the remarks made by the prosecutor in the present case influenced the jury and contributed to the verdict. Furthermore, the trial court instructed the jury that statements made by the assistant district attorney should not be considered as evidence. For the reasons discussed, this assignment lacks merit.

**DECREE**

Defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED**.